**UNITED STATES of America, Plaintiff,**
**v.**
**SCHOOL DISTRICT 151 OF COOK COUNTY, ILLINOIS; Charles Watts, Superintendent of School District 151; Richard Graf, Wallace Davis, Louis Wiersma, Gerald Bennett, James Hendrix, Donald McGee, and Hobart Krillic, Members of the Board of Education of School District 151 of Cook County, Illinois, Defendants.**

**Civ. A. No. 68 C 755.**

United States District Court
N. D. Illinois, E. D.
May 15, 1969.

Thomas A. Foran, U. S. Atty., Jack B. Schmetterer, Asst. U. S. Atty., Chicago, Ill., J. Harold Flannery, Robert Pressman, Attys., John N. Mitchell, Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff.

Louis Ancel, Marvin J. Glink and Ronald M. Glink, Chicago, Ill., John Merrill Van Der Aa, South Holland, Ill., for defendants.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, District Judge.

This is a civil rights action brought by the plaintiff under 42 U.S.C. Sec. 2000c–6(a) seeking an order directing the defendants to desegregate grammar schools in Illinois School District 151. On July 8th, 1968, and after extensive hearings, the district court determined that the defendants and their predecessors were guilty of denying Negro children in District 151 equal protection of the law in violation of the Fourteenth Amendment by virtue of the defendants' invidiously discriminatory policies, decisions and practices based solely on the fact that the children are Negroes, and the district court, accordingly, issued its preliminary injunction order against the defendants based on its findings of fact and conclusions of law. See United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D. Ill.1968). The United States Court of Appeals for the Seventh Circuit affirmed the preliminary injunctive order for the government, and remanded the cause to the district court for further proceedings upon the government's motion for a permanent injunction on December 17, 1968. See School District 151 of Cook County, Illinois v. United States, 404 F.2d 1125 (7th Cir. 1968). Pursuant to the directive of the Court of Appeals, the district court conducted hearings beginning with January 13, 1969, and ending on February 17, 1969. As a result of these hearings and a careful examination of the transcript of evidence consisting of 2,867 pages, together with all of the documentary exhibits, the court has determined that the government is entitled to a permanent injunction against the defendants.

For an American who is devoted to his country and wants to believe in the intelligence and good-will of its citizens it is very painful to contemplate and difficult to understand continued resistance to school desegregation. It should be, but apparently it is not, unnecessary to restate the fact that not only has the United States Supreme Court held segregation to be illegal and morally reprehensible (Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)) but also that social and educational research have corroborated the finding that it is damaging to the student's personality and intellectual development (United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D.Ill.1968).

The separation of black and white children is in itself an inhibiting factor. In any community where one school is black and one predominantly white nobody needs to be told which is considered the good school. This is the case whether segregation is the result of an old housing pattern, the flight of white residents or the construction of a new school on a site beyond the walking distance of Negro children. The implication, and not infrequently the assertion, that the Negro school is "undesirable" disheartens both pupils and teachers and limits their expectations. Because it saps the pupil's motivation, his achieve-

ment level drops below his actual capacity and gives ostensible confirmation to the fear that he is somehow deficient. In other words, the school which should help him to resolve his self-doubts, strengthen his self-respect and encourage his aspirations actually does the reverse.

The correlation between high expectations and excellent performance, low expectations and poor performance is so obvious and well documented that even without test scores to prove the point, it should be obvious that Negro children make better progress in desegregated schools where success is the rule than in all-Negro schools where it is usually the exception. By this time also the apprehensions of white parents should have been dispelled by the reports and testimony of educators who have found that the performance of white children has not been adversely affected by the introduction of Negroes into their classes. The academic record of white children attending integrated schools has paralleled that of comparable white students in all-white schools and they have, in addition, received the bonus of interaction with members of a different race, a matter of vital importance in our pluralistic society.

Conversely, segregation harms the white as well as the black student. Just as racial isolation tends to cripple a black child by inducing a feeling of inferiority, it inflates the white child with a false belief in his superiority. These seeds of prejudice and animosity produce particularly noxious weeds when they are not planted adventitiously and merely permitted to sprout but when they are nourished by the deliberate practice of segregation.

The lack of white teachers in black schools and black teachers in white schools cannot be inadvertent or attributable to their place of residence, as in the case of children. When transfer privileges are applied unequally, when attendance areas are not clearly defined and boundary lines are shifted in such a manner as to keep the races apart, segregation cannot successfully be passed off as the incidental result of a neighborhood school policy. Opposition to bussing does not gain respectability by being verbalized as solicitude for the Negro child who might have to be bussed. This court has neither seen nor heard any evidence to indicate that transporting a Negro child to a desegregated school is more hazardous than transporting white children away from one. For many years, millions of children in rural districts and pupils with severe handicaps have withstood the "hardship" of long bus rides. Clearly, the important consideration from every point of view is not the trip in the yellow bus but the quality and composition of the school at the end of it.

Bussing costs money, to be sure, but the hidden costs of discrimination run much higher. They are incalculable in terms of the waste of human resources that occurs when schools award eighth grade diplomas to Negro students with a sixth grade reading level and a man-sized burden of frustration. Not only for the sake of the individual student but for the maintenance of American democracy, free public education must be free of bias as well as free of charge. Desegregation is a very small down payment on an investment whose dividends are good citizenship, justice and the welfare of the nation.

The time is long past when school boards can be permitted to shirk their full responsibility and fail to eliminate discriminatory practices without the necessity of a court order.

The court is of the opinion that the objections of the United States of America to the Kennedy School desegregation proposal should be sustained, and that the permanent relief sought by the plaintiff should be granted, based on the entry of its Findings of Fact and Conclusions of Law hereinbefore and as hereafter set forth in this memorandum of decision.

There will be an order providing that the objections filed on November 22,

1968 by the United States of America to the Kennedy School desegregation proposal submitted by the defendants on October 30, 1968, be and the same hereby are sustained and that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently enjoined from discriminating on the basis of race or color in the operation of School District 151 and in the assignment of teachers and students to schools in that district. As set out more particularly in the body of the decree being entered by the court today, the defendants shall take affirmative action to disestablish school segregation and eliminate the effects of prior unlawful conduct in the operation of the school system.

In accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure, findings of fact and conclusions of law are included in this memorandum of decision together with the court's order.

### FINDINGS OF FACT*

(1) School District 151 is an elementary public school district organized and existing under the laws of the State of Illinois. It is located in Cook County, Illinois, and consists of portions of the communities of Phoenix, Harvey, and South Holland. The District has a total area of about 4.5 square miles (Answer, para. 3; Gov't Exs. C–5; P–4; E–2, p. 6; E–8, p. 1).

(2) Dr. Thomas Van Dam is Superintendent of School District 151. Richard Graf, Hannes Johnson, Louis Wiersma, Gerald Bennett, James Hendrix, Robert Zielenga and Hobart Krillic are the members of the Board of Education of School District 151. Under the laws of the State of Illinois, the members of the Board of Education and the Superintendent are charged with the responsibility of operating the public schools in District 151 (Answer of June 3, 1968, para. 6; Answers of December 19, 1968). Dr. Charles Watts was the Superintendent of School District 151 from about July 1, 1967 to August 16, 1968 (Tr. 736 (Watts); Gov't Ex. AAA, p. 2). Eli Bogolub was a member of the Board of Education of School District 151 from 1964 until April of 1968, during which time he served one year as Board secretary and three years as Board president. (Tr. 506–7).

(3) The following table lists the schools located in School District 151, the dates of their initial utilization, and their locations.

| Schools | Date of Initial Use | Location |
| --- | --- | --- |
| Roosevelt | 1931 | 320 E. 161st Place, S. Holland |
| Coolidge | 1933 | 155th St. and 7th Ave., Phoenix |
| Madison | 1957–58 | 157th St. and Orchid Dr., S. Holland |
| Eisenhower | 1960–61 | 16001 Minerva Ave., S. Holland |
| Taft | 1966–67 | 163rd Street and Union, Harvey |
| Kennedy | 1966–67 | 155th St. and 8th Ave., Phoenix |

(Gov't Exs. C–5; D–18, pp. 3, 13; D–19, pp. 10, 12) Through the end of the 1967-68 school year, the Roosevelt, Madison, Eisenhower and Taft Schools served grades kindergarten through eight; the Kennedy School served grades kindergarten through three; and the Coolidge School served grades four through eight. (Gov't Exs. C–5, CC, p. 4) The Kennedy and Coolidge Schools are separate buildings located adjacent to each other. (Gov't Exs. C–5, P–4)

(4) During the 1968–69 school year, in accordance with this Court's order of

* Transcript references for the hearings on June 19–21, 24–28 and July 1–2, 1968, are given as Tr. ——, and those for the hearings on January 20–24, 27–31 and February 3–7, 10–14 and 17, 1969, as Tr. II ——.

July 22, 1968, the Roosevelt, Madison, Eisenhower and Taft Schools serve grades kindergarten through six; the Kennedy School serves grades kindergarten through two; and the Coolidge School serves all seventh and eighth grade students in District 151. Students in grades three through six residing in Phoenix attend the Roosevelt, Madison, Eisenhower and Taft schools (Supplementary Order, July 22, 1968; Gov't Ex. CC).

(5) Approximately 98 percent of the residents of Phoenix are Negroes. (Tr. 153 (Kingsland); Tr. 367–8 (Watkins)) The part of Phoenix in School District 151 is bounded on the north by 151st Street, on the west by Halsted Street, on the south by the Grand Trunk Railroad tracks and 155th Street, and on the east by 9th Avenue and Van Drunen Road (Gov't Ex. P–4) No Negroes reside in any area of School District 151 other than in Phoenix. (Tr. 175 (Kingsland))

(6) Prior to the 1968–69 school year, no Negro student attended the Madison or Eisenhower Schools; no Negro student attended Roosevelt School during the regular school year, but Negroes attended summer school sessions at Roosevelt; and no Negro student attended the Taft School, except for approximately ten mentally handicapped students, during the 1967–68 school year. (Tr. 154–157 (Kingsland); Tr. 289 (McGovern)) Mentally handicapped students are assigned to schools without regard to residence. (Tr. 289 (McGovern))

(7) In 1948, the enrollment of the Coolidge School was approximately 70 percent white. (Tr. 151, 155 (Kingsland)) As of the 1956–57 school year, and thereafter, through the end of the 1967–68 school year, the enrollment of the Coolidge School was almost entirely Negro. (Tr. 296 (McGovern); Tr. 155 (Kingsland)) The enrollment of the Kennedy School has been almost entirely Negro for 1966–67, 1967–68 and 1968–69, the three school years of its operation. (Tr. 158 (Kingsland); Tr. 290–1 (McGovern)); Supplementary Order, July 22, 1968) During the 1967–68 school year, there were approximately 10 or 12 white children in the Coolidge and Kennedy Schools, some of whom were mentally handicapped children assigned without regard to residence. (Tr. 289–290, 296 (McGovern); Tr. 748–9 (Watts))

(8) Total regular student enrollment in District 151 schools was approximately as follows at the dates indicated:

| | May, 1968 | November-December, 1968 |
| --- | --- | --- |
| Coolidge | 425 | 483 |
| Kennedy | 392 | 313 |
| Roosevelt | 447 | 429 |
| Madison | 442 | 383 |
| Eisenhower | 626 | 519 |
| Taft | 308 | 341 |
| Total | 2640 | 2468 |

(Gov't Ex. CC, pp. 1, 4).

*Faculty and Staff Assignment*

(9) When George Kingsland became Superintendent in School District 151 in 1948, all teachers in the District were white. (Tr. 151, 160 (Kingsland)) The first Negro teacher in School District 151 was Huel Gwin, who was employed at the Coolidge School for the 1953–54 school year. (Tr. 313, 315 (McGovern); Gov't Ex. D–12, p. 4) During the 1964–65 school year, a Negro music teacher and a Negro permanent substitute teacher taught in all schools in the District. These teachers were the first Negro teachers assigned to teach in School District 151 in schools other than Coolidge. (Tr. 180–1, 186–7 (Kingsland); Tr. 294 (McGovern); Gov't Exs. F–3, p. 56; F–4, p. 1; O–1(a), pp. 6–9 (McGovern))

(10) Before the 1966–67 school year, no full-time Negro classroom teacher was employed in the Roosevelt, Madison, Eisenhower or Taft Schools. (Tr. 292–3 (McGovern); 163–5 (Kingsland); Gov't Ex. R) One Negro classroom teacher was employed in each of these schools on a full-time basis for the 1966–67 school year (Tr. 292–3 (McGovern); 163–5 (Kingsland); Gov't Ex. R), as the result of a decision by the Board of Education to have one Negro teacher for each of these schools for that year. (Tr. 192–3 (Kingsland); Tr. 521–3 (Bogolub)) Two Negro classroom teachers were employed at the Roosevelt, Eisenhower and Taft Schools for the 1967–1968 school year and one at the Madison School. (Gov't Ex. J–1, pp. 2–3)

(11) The number of full-time teachers, by race, employed at each of the schools in the District for the school terms 1953–54 to 1968–69 is shown on the following table:

*Faculty*

| Year | School | White | Negro | Race Unknown |
|---|---|---|---|---|
| 1953–54 | Roosevelt | 12 | 0 | 0 |
| | Coolidge | 7 | 1 | 1 |
| 1954–55 | Roosevelt | 15 | 0 | 0 |
| | Coolidge | 8 | 2 | 1 |
| 1955–56 | Roosevelt | 17 | 0 | 0 |
| | Coolidge | 9 | 3 | 0 |
| 1956–57 | Roosevelt | 18 | 0 | 0 |
| | Coolidge | 9 | 5 | 0 |
| 1957–58 | Roosevelt | 20 | 0 | 0 |
| | Coolidge | 6 | 9 | 0 |
| | Madison | 6 | 0 | 0 |
| 1958–59 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 6 | 12 | 0 |
| | Madison | 13 | 0 | 0 |
| 1959–60 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 2 | 17 | 0 |
| | Madison | 16 | 0 | 0 |
| 1960–61 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 0 | 22 | 0 |
| | Madison | 16 | 0 | 0 |
| | Eisenhower | 8 | 0 | 0 |
| 1961–62 | Roosevelt | 20 | 0 | 0 |
| | Coolidge | 0 | 25 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 9 | 0 | 0 |
| 1962–63 | Roosevelt | 21 | 0 | 0 |
| | Coolidge | 0 | 26 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 17 | 0 | 0 |
| 1963–64 | Roosevelt | 23 | 0 | 0 |
| | Coolidge | 0 | 25 | 0 |
| | Madison | 16 | 0 | 0 |
| | Eisenhower | 14 | 0 | 0 |
| 1964–65 | Roosevelt | 24 | 0 | 0 |
| | Coolidge | 1 | 28 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 16 | 0 | 0 |

| Year | School | White | Faculty Negro | Race Unknown |
|------|--------|-------|---------------|--------------|
| 1965–66 | Roosevelt | 14 | 0 | 0 |
| | Coolidge | 1 | 12 | 0 |
| | Madison | 14 | 0 | 0 |
| | Eisenhower | 12 | 0 | 0 |
| | Kennedy | 0 | 10 | 0 |
| | Taft | 5 | 0 | 0 |
| 1966–67 | Roosevelt | 16 | 1 | 0 |
| | Coolidge | 0 | 16 | 0 |
| | Madison | 16 | 1 | 0 |
| | Eisenhower | 17 | 1 | 0 |
| | Kennedy | 0 | 15 | 0 |
| | Taft | 8 | 1 | 0 |
| 1967–68 | Roosevelt | 17 | 2 | 0 |
| | Coolidge | ½ | 21 | 0 |
| | Madison | 18 | 1 | 0 |
| | Eisenhower | 19 | 2 | 0 |
| | Kennedy | ½ | 18 | 0 |
| | Taft | 12 | 2 | 0 |
| 1968–69 | Roosevelt | 13 | 3 | 0 |
| | Coolidge | 17 | 10 | 0 |
| | Madison | 10 | 5 | 0 |
| | Eisenhower | 12 | 6 | 0 |
| | Kennedy | 4 | 7 | 0 |
| | Taft | 10 | 7 | 0 |

(Gov't Exs. R; FFF, pp. 29–34)

(12) The following table shows the number of vacancies in teaching positions at schools in School District 151 for each school year from 1953–54 to 1967–68 and the racial composition of the teachers filling these vacancies:

| Year | Vacancies or New Positions at Predominantly White Schools | Hired W | Hired N | Vacancies or New Positions at Predominantly Negro Schools | Hired W | Hired N |
|------|------|-----|-----|------|-----|-----|
| 1967–68 | 32 | 29 | 3 | 10 | 1 | 9 |
| 1966–67 | 35 | 31 | 4 | 11 | 0 | 11 |
| 1965–66 | 22 | 22 | 0 | 13 | 0 | 13 |
| 1964–65 | 12 | 12 | 0 | 4 | 1 | 3 |
| 1963–64 | 18 | 18 | 0 | 2 | 0 | 2 |
| 1962–63 | 23 | 23 | 0 | 6 | 0 | 6 |
| 1961–62 | 19 | 19 | 0 | 6 | 0 | 5 |
| 1960–61 | 21 | 21 | 0 | 5 | 0 | 5 |
| 1959–60 | 9 | 9 | 0 | 9 | 1 | 8 |
| 1958–59 | 11 | 11 | 0 | 5 | 1 | 4 |
| 1957–58 | 12 | 12 | 0 | 5 | 1 | 4 |
| 1956–57 | 4 | 4 | 0 | 5 | 3 | 2 |
| 1955–56 | 3 | 3 | 0 | 5 | 2 | 3 |
| 1954–55 | 2 | 2 | 0 | 2 | 1 | 1 |
| 1953–54 | 4 | 4 | 0 | 2 | 1 | 1 |
| Total | 227 | 220 | 7 | 89 | 12 | 77 |

(Gov't Ex. R)

(13) During the period from September 5, 1967, through February 8, 1968, the defendants assigned substitute teachers on the basis of race. Approximately 75 percent of the total assignments given to Negro substitute teachers were to the predominantly Negro Coolidge and Kennedy Schools. Of substitute assignments made to predominantly white schools, 91 percent went to white teachers. (Gov't Ex. S)

(14) The racial composition of the faculties at the schools of School District 151 in the period from the 1953–54 school year through and including the 1967–68 school year was the result of a deliberate decision by the defendants and their predecessors in office to assign teachers to schools on the basis of race. With few exceptions, white faculty members were employed for and assigned on the basis of their race to schools attended only or almost entirely by white students. Negro faculty and staff members were generally employed for and assigned on the basis of their race to schools attended only, or almost entirely by Negro students (Gov't Exs. G–1, pp. 184–7; Q–1 through Q–5; R; S; Tr. 178–191, 246, 250–51 (Kingsland); Tr. 301–305, 307–9, 311–12 (McGovern); Tr. 518–523 (Bogolub); Tr. 694–695 (Gesell); Tr. 1438–9 (Gowens)).

(15) The assignment policy summarized in paragraph 14 was responsible, in part, for the fact that the schools in District 151 became racially identifiable. The racial composition of the faculties at the Coolidge and Kennedy Schools contributed to making them "Negro schools." The racial composition of the faculties of the Roosevelt, Madison, Eisenhower and Taft Schools contributed to making them "white schools."

*School Bus Transportation Practices*

(16) Beginning in the 1940's and continuing until the opening of the Taft School for the 1966–67 school year, white children living in the Harvey Highlands area of District 151 and in the area bounded by Halsted Street on the west, Route 6 on the south and the Grand Trunk Railroad tracks on the northeast were bussed to the Roosevelt School (Tr. 196–7, 200–2 (Kingsland); Gov't Exs. E–1 through E–7; Finding 5). These two areas are located closer to the Coolidge School than to the Roosevelt School (Gov't Exs. P–3, P–4). During the period of this bussing, only white children attended the Roosevelt School, and the enrollment of the Coolidge School became progressively more Negro in character until it was almost entirely Negro (Findings 6 and 7). The bussing of these children to the Roosevelt School instead of the Coolidge School was not justified by any safety factor (Tr. 280 (Kingsland); Tr. 963–4 (Watts); Gov't Exs. P–3, P–4).

(17) Beginning no later than the start of the 1956–57 school year, and continuing through the 1967–68 school year, white children living in the general area of District 151, east of Phoenix, north of Robin Lane and west of the Little Calumet River, and on the portion of Wabash Street located at the north central boundary of the District, an area closer to the Coolidge and Kennedy Schools than to the Roosevelt School, were transported by bus to the Roosevelt School (Tr. 202–17 (Kingsland); Tr. 744–8 (Watts); Gov't Exs. E–1 through E–9; T–1; T–2; T–3; Finding 6). The following table shows the number of students so transported for all school years from 1960–61 to 1967–68, with the exception of 1962–63:

| Year | Number Students Bussed |
|---|---|
| 1960–61 | 35 |
| 1961–62 | 37 |
| 1963–64 | 33 |
| 1964–65 | 53 |
| 1965–66 | 59 |
| 1966–67 | 67 |
| 1967–68 | 83 |

(Gov't Exs. E–2; E–3; E–5; E–6; E–7; E–8; E–9; T–1; T–2; T–3). During the period of this transportation, the enrollment of the Roosevelt School was all-white and that of the Coolidge School, and after its construction the

Kennedy School, almost entirely Negro (Findings 6 and 7). The transporting of these children to the Roosevelt School instead of the Coolidge and Kennedy Schools was not justified by any safety factor (Tr. 279 (Kingsland); Tr. 744-8; 964 (Watts); Gov't Exs. P-3; P-4).

(18) Some of the white children bussed to the Roosevelt and Taft Schools (Findings 16 and 17) lived less than 1½ miles from those schools (Gov't Exs. E-2, p. 1; E-3, p. 10; E-4, p. 1; E-5, p. 3; E-6, p. 1; E-7, p. 1; E-8, p. 1; E-9, p. 29), and were provided school bus transportation for safety reasons. (Gov't Exs. P-3, P-4; Tr. 840-850 (Watts). Although safety reasons have been given as the basis for not assigning white children to the Coolidge and Kennedy Schools (Gov't Ex. F-6, pp. 19-23), no bus service was provided to those schools for white children before the 1968-69 school year. (Tr. 196-7, 200-217, 279-80 (Kingsland); Tr. 963-4 (Watts); Findings 5, 6, 7, 16 and 17; Gov't Exs. E-1 through E-9).

(19) In District 151, prior to the 1968-69 school year, with the exception of special education students, no white children were bussed to the Coolidge or Kennedy Schools and no Negro children to the Roosevelt, Taft, Madison and Eisenhower Schools (Tr. 289-91 (McGovern); Findings 5, 6, 16, 17, 18 and 19).

(20) The purpose and effect of that program of school bus transportation referred to in Findings 16 through 19 was to segregate the students of School District 151 on the basis of race and color (see also Tr. 747-9, 963-4 (Watts)).

*Site Selection and School Construction*

(21) In February 1964, a referendum was held in School District 151 on a proposal presented by the Board of Education for the construction of a school in the southwest portion of the district. (Gov't Ex. F-3, pp. 23-5.) The residents of the district were informed that this school would be attended by the "overflow" from the Roosevelt and Coolidge Schools and that it would, therefore,

serve Negro and white students. (Gov't Exs. F-3, p. 2; O-2(a), pp. 4-5 (Graf)). There was considerable opposition to a school in this proposed location among residents in the southwest part of the District on grounds that it would be integrated. (Gov't Exs. F-3, pp. 14, 16, 18-19; O-2(a), pp. 7-9, 11-12 (Graf)). The proposal was defeated in the referendum. (Gov't Ex. F-3, pp. 31-2).

In April 1964, after four new board members had been elected (Gov't Ex. O-2(a), pp. 14-15 (Graf)), the majority of Board members believed that the sentiment of the district opposed desegregated schools and that the voters of District 151 would not aprove a referendum for facilities which would, because of their location, result in integration of students. The Board accordingly proposed, among other things, the construction of two schools, one in the far southwest part of the district and the other as an addition to the existing, almost entirely Negro Coolidge School (Tr. 515-6 (Bogolub); Tr. 785-6 (Watts); Tr. 386 (Watkins); Tr. II 2052-3 (Graf); Gov't Exs. O-2(a), pp. 13-19, 23-26 (Graf); F-4, p. 30; GGG, p. 2). At a referendum held on December 5, 1964, the proposal containing, among other things, these specific locations passed. The schools which were constructed pursuant to this authorization were the Kennedy and Taft Schools (Tr. 508, 517 (Bogolub)).

(22) Prior to the referendum of December, 1964, during the period in which the Board of Education was considering possible locations for the construction of new facilities, Mr. L. K. Watkins, a Negro Board member, suggested utilization of a site in South Holland, south of 151st Street and east of 9th Avenue. (Tr. 377-86 (Watkins); Gov't Ex. F-4, p. 29). A school in this location would probably have been integrated because of residential patterns in the area. (Tr. 377-86 (Watkins); Gov't Ex. O-2(a), pp. 24-6; T-1, T-2, T-3; Finding 5). The opinion of a majority of Board members, that the voters would not support a referendum for a school which would be

integrated, was a substantial factor in the decision not to accept the site proposed by Mr. Watkins. (Tr. 377–86 (Watkins); Tr. 510–515 (Bogolub); Tr. 785–6 (Watts); Tr. II 2052–3 (Graf); Gov't Exs. O–2(a), pp. 24–5 (Graf); GGG, p. 2; Finding 21).

(23) The sites for the Taft and Kennedy Schools were selected at least in part so as to promote and preserve the racial segregation of students in School District 151. The construction of these schools had this effect.

### Attendance Zones

(24) There was no written statement of the attendance zone boundaries for District 151 schools, prior to a Resolution adopted on October 5, 1964 (Tr. 205–6, 219–221 (Kingsland); Tr. 405 (Watkins); Gov't Exs. O–2(a), pp. 53–4 (Graf); F–4, pp. 27–8). The boundaries were again placed in written form on September 9, 1966, at the time of the opening of the Taft and Kennedy Schools (F–6, pp. 27–8).

(25) Beginning in the 1920's and continuing until about 1947, some white children living in School District 151 in South Holland on 153rd Street (also known as 157th Street) between State Street (also known as Indiana Avenue) and 9th Avenue, and on State Street nearby, attended the Phoenix School and, after its opening in about 1933, the Coolidge School (Tr. 457–458 (Watkins); Tr. 720–7 (Tromp); Gov't Exs. A–22; B–1; B–2; B–3). The area in which these children lived is located closer to the Coolidge School than to the Roosevelt School (Gov't Exs. P–3; P–4; T–1; T–2; T–3).

(A) In the period between the 1920's and 1945, children of Peter and Anna DeYoung who resided on 153rd Street, as specified above, attended the Phoenix and Coolidge Schools (Tr. 721, 725 (Tromp); Gov't Exs. A–22, pp. 30–1, 32–3, 88–9, 113–4, 115–6; B–1).

(B) In the period between the 1930's and 1947, children of Harry and Anna Ravesloot who resided on 153rd Street, as specified above, attended the Phoenix and Coolidge Schools (Tr. 721, 726 (Tromp); Gov't Exs. A–22, pp. 34–5, 36–7, 84–5, 98–9, 115–6, 117–8, 127–8; B–2).

(C) In the period between the 1930's and 1947, children of Richard and Cora Eylander, who resided on 153rd Street, as specified above, attended the Coolidge School (Tr. 723, 726 (Tromp); Gov't Exs. A–22, pp. 30–1, 36–7, 76–7, 92–3, 117–8; B–3).

(D) Within the time period specified in this Finding, Herbert DeYoung whose residence was located on State Street about 300 feet south of 153rd Street attended school in Phoenix (Tr. 721–2, 725–6 (Tromp)).

(26) In the period between the 1930's and 1947, children of Joe and Christiana Tromp, whose residence was located in South Holland on the north side of 151st Street, at the northern terminus of 9th Avenue, attended the Coolidge School. (Tr. 718–9, 727 (Tromp); Gov't Exs. A–22, pp. 13–14, 88–9, 92–3, 100–1, 103–4, 109–10; B–4).

(27) The home of Jasper Tromp, a former member of the Board of Education of School District 151, is located in South Holland, a short distance east of the corner of 151st Street and 9th Avenue (Tr. 202–3 (Kingsland); 728–9 (Tromp)). Diane and Joe Tromp, children of Jasper Tromp, attended the Coolidge School from 1949 and 1954, respectively, until January 4, 1956 and September 4, 1956, respectively (Gov't Ex. Q–6), at which time they transferred to the Roosevelt School (Gov't Ex. Q–6; Tr. 202–6, 281). The Tromp residence was located within walking distance of the Coolidge School (Tr. 204 (Kingsland)). Diane and Joe Tromp were bussed to the Roosevelt School (Tr. 206 (Kingsland)). Jasper Tromp was a member of the Board of Education of District 151 at the time of his children's transfer (Tr. 258 (Kingsland)). The Tromp children were white (Finding 6).

(28) During the 1956–57 school year, Mrs. Iola Toler, a Negro resident of Phoenix, and several other Negro residents of Phoenix attempted to enroll chil-

dren at the Roosevelt School in South Holland. They were not permitted to register the children. (Tr. 702–705 (Toler)).

(29) The Court finds, based upon the evidence summarized below, that beginning no later than the start of the 1956–57 school year and continuing through the 1967–68 school year, an increasing number of white children who lived in South Holland east of Phoenix attended the Roosevelt School despite the fact that the area in which they lived was closer to Coolidge, and later Coolidge and Kennedy; no safety factor justified assigning them only to Roosevelt, some could have walked to Coolidge and Kennedy and children from the same general area had previously attended Coolidge.

(A) Beginning no later than the 1956–57 school year and continuing through the 1967–68 school year, white children residing in South Holland, east of Phoenix, west of the Little Calumet River and north of Robin Lane, and on the portion of Wabash Street located at the north central boundary of District 151, an area located closer to Coolidge than Roosevelt, attended the Roosevelt School to which they were bussed (Finding 17). The number of children attending the Roosevelt School from this area was approximately as follows for the years specified:

| | | | |
|---|---|---|---|
| 1960–61 | : 35 | 1965–66 | : 59 |
| 1961–62 | : 37 | 1966–67 | : 67 |
| 1963–64 | : 33 | 1967–68 | : 83 |
| 1964–65 | : 53 | | |

(Finding 17)

For the 1964–65, 1965–66, 1966–67 and 1967–68 school years, children from the area referred to above attended the Roosevelt School in accordance with attendance zones adopted by Resolution of the Board of Education of School District 151 (Gov't Exs. F–4, pp. 27–8; F–6, 27–8).

(B) The children referred to in Paragraph (A) were Diane and Joe Tromp (Finding 27); Jerry Tromp, another child of Jasper Tromp who attended the Roosevelt School from 1960 through the 1967–68 school year (Tr. 206–9 (Kingsland); Tr. 723, 727 (Tromp); Gov't Exs. E–2, p. 14; E–9, p. 20); children who lived on 153rd Street (also known as 157th Street) between Ninth Avenue in Phoenix and State Street (Gov't Exs. E–5, pp. 5, 12, 15, 16; E–6, pp. 6, 13, 16, 18; E–7, pp. 5, 16, 18; E–8, pp. 3, 6, 7; E–9, pp. 5, 6, 7, 9, 10, 12, 14, 15, 17, 21; T–1; T–2; and T–3); a street referred to in Finding 25; and other children from the same general geographical area of School District 151, as described above (Tr. 725–6 (Tromp); Gov't Exs. E–2 through E–9; P–3; P–4; T–1; T–2; T–3).

(C) No safety factor justified assignig the children referred to in Paragraphs (A) and (B) only to the Roosevelt School (Gov't Exs. P–3, P–4; Tr. 744–9, 963–4 (Watts); Tr. 279 (Kingsland)). Some of these children could have walked to the Coolidge School. This group of children included the three Tromp children referred to in Finding 27 and Paragraph (B) above (Tr. 204, 208–9 (Kingsland); Gov't Exs. P–3, P–4). It also included children living on 153rd Street (also known as 157th Street) between 9th Avenue in Phoenix and State Street, referred to in (B) above, who walked to State Street to board a bus for a trip of about 1.25 miles to the Roosevelt School (Tr. 210–12 (Kingsland); Gov't Exs. P–3; P–4; T–1; T–2; T–3). In the period between 1960–61 and 1967–68, three children named Schippers, whose home is located on 153rd Street about six-tenths of a mile from Coolidge and Kennedy, attended Roosevelt (Gov't Exs. E–2, p. 20; E–3, p. 3; E–5, p. 15; E–6, p. 16; E–7, p. 16; E–8, p. 6; E–9, pp. 5, 21; T–1; T–2, p. 7; T–3). The Schippers children walked about the same distance east on 153rd Street to board the bus for Roosevelt, as they would have walked west on that street on their way to Coolidge and Kennedy, had they been assigned to those schools. (Gov't Exs. T–1; T–2, p. 7; T–3).

(30) Beginning in the 1940's and continuing until the opening of the Taft School for the 1966–67 school year, white

children living in the Harvey Highlands area of District 151 and in the area bounded by Halsted Street on the west, Route 6 on the south and the Grand Trunk Railroad tracks on the northeast attended the Roosevelt School to which they were transported by bus (Tr. 196–7, 200–2 (Kingsland); Gov't Exs. E–1 through E–7; Finding 5). These two areas are located closer to the Coolidge School than to the Roosevelt School (Gov't Exs. P–3, P–4). During the period, only white children attended the Roosevelt School, and the enrollment of the Coolidge School became progressively more Negro in character until it was almost entirely Negro (Findings 6 and 7). The attendance of these children at the Roosevelt School instead of the Coolidge School was not justified by any safety factor (Tr. 280 (Kingsland); Tr. 963–4 (Watts); Gov't Exs. P–3, P–4). For the 1964–65 and 1965–66 school years, the children from the area specified above attended the Roosevelt School in accordance with attendance zones adopted by Resolution of the Board of Education of School District 151 (Gov't Ex. F–4, pp. 27–8).

(31) The attendance zone boundaries adopted by Resolution of the Board of Education of School District 151 on October 5, 1964, and September 6, 1966, placed in the attendance area for the Coolidge School (1964) and the Coolidge and Kennedy Schools (1966) all of Phoenix, but no other area of School District 151 in which residences are located. (Gov't Exs. F–4, pp. 27–8; F–6, pp. 27–8; P–3).

(32) The attendance zone boundaries adopted on September 6, 1966, referred to in Finding 31, followed a written recommendation to the Board of Education by a Committee of three Board members, Richard Graf, Thomas Mulhern and Hannes Johnson, who studied boundaries in connection with the opening of the Taft and Kennedy Schools (Gov't Ex. F–6, pp. 11, 19–23, 27–8). The Committee Report stated in part:

"It was agreed that the philosophy of the Board in determining boundaries was to have all children in the district attend a neighborhood school to which they could walk safely.

A. A neighborhood was construed to be a specific area of like socio-economic level, local in nature, larger than the narrow confines of a block, but still not a community in the larger sense defined by Webster." (Gov't Ex. F–6, p. 19)

The members of the Committee believed that Phoenix, whose residents were about 98 percent Negro, was a distinct socio-economic area in School District 151, and the boundaries which they recommended were in part based upon the opinion that distinct socio-economic areas should be in separate attendance zones (Gov't Exs. F–6, pp. 21–2; GGG; O–3 (a), pp. 27–35 (Graf); Tr. II 2115–7 (Johnson); Finding 5). The recommendations of the Committee were also in part based upon an intention to promote and perpetuate the racial segregation of students in School District 151 (Tr. 571–3, 525–6 (Bogolub); Tr. 749 (Watts). See also Tr. 192–3 (Kingsland); Tr. 377–86 (Watkins); Tr. 510–17, 521–3 (Bogolub); Tr. 747–9, 783–6, 796, 798–800 (Watts); Tr. 1368–9 (Graf); Tr. II 2052–3 (Graf); Tr. II 2115–7 (Johnson); Gov't Exs. F–6, pp. 19, 21–2; GGG; O–2(a), pp. 13–19, 23–6 (Graf); O–3(a), pp. 27–35, 44–49 (Graf)).

(33) The Committee Report, referred to in Finding 32, ·recommended including in the attendance zone for the Roosevelt School the area east of Phoenix, located closer to the Coolidge and Kennedy Schools than to Roosevelt, in which only white children lived, and transporting these children by bus to the Roosevelt School (Gov't Ex. F–6, p. 23; Finding 29). This recommendation was adopted (Findings 31 and 32). This portion of the Committee recommendation was based in part upon an analysis of available class room space in District 151 schools, including Coolidge and Kennedy, for 1966–67, based upon enrollment information (Gov't Ex. F–6, p. 21). The Report failed to note that there would be, based upon the information utilized,

at least 5 empty rooms at Coolidge and/or Kennedy in 1966–67 (Gov't Exs. F–6, p. 21; L–3, pp. 4–5). Considering these rooms, and rooms available at Coolidge and/or Kennedy during the 1967–68 school year, there was adequate space at Coolidge and Kennedy for the 67 white children in 1966–67 and 83 white children in 1967–68, living closer to those schools than Roosevelt, but assigned to the Roosevelt School (Finding 29; Gov't Ex. L–3, pp. 4–5; Tr. II 249–50 (Crarey)). A second basis advanced by the Committee for the assignment of white children to Roosevelt instead of Coolidge and Kennedy was that, under Illinois law, state reimbursement for regular student transportation is limited to children transported more than 1½ miles to school (Gov't Ex. F–6, p. 20). Under the attendance zones recommended by the Committee, adopted by the Board, white children were transported by bus less than 1½ miles to the Roosevelt School (Gov't Ex. E–8, pp. 3–8), and for 1966–67, 116 of 285 students transported by bus in District 151 were transported less than 1½ miles to school (Gov't Ex. E–8, p. 1). Other white children in School District 151 have been transported less than 1½ miles to school (Finding 18).

(34) The purpose and the effect of the student assignment policies and practices summarized in Findings 24 to 33 were to segregate students in School District 151 on the basis of race.

*Educational Structure of School District 151*

(35) In February 1967, following a study requested by the Board of Education of School District 151, a team of five educators recommended institution of an upper grade center program for the District, proposing use of the Taft facility. (Gov't Ex. H–1, pp. 9–11; Tr. 764–5) The recommendation with respect to Taft was based in part on the view that it was not yet fully completed and could be modified. (Tr. 1468–69 (Hannum)). During 1967, the five final candidates for the superintendency of School District 151, filled in July 1967 by Dr.

Charles Watts, expressed the opinion that establishment of an upper grade center program would improve the quality of education in School District 151. (Tr. 765–6 (Watts)).

(36) In early 1968 Superintendent Charles Watts presented to the Board of Education of School District 151 for consideration three proposals for new construction and/or reorganizing the structure of District 151 schools (Gov't Ex. L–3; Tr. 759–61 (Watts)). Plan A provided for construction at the Madison and Eisenhower Schools and retention of existing attendance areas (Gov't Ex. L–3, p. 4). Plan B provided for the creation of an upper grade center for all eighth and some seventh grade students at the Roosevelt School, some modification of attendance areas and some construction at the Eisenhower and Madison Schools (Gov't Ex. L–3, p. 6). Plan C provided for the use of the Coolidge School as an upper grade center for all seventh and eighth grade students in the District with students from Phoenix in grades three through six assigned to the Taft, Roosevelt, Madison and Eisenhower Schools (Gov't Ex. L–3, p. 8). Plan C, as initially proposed, provided for some construction at the Madison and Eisenhower Schools, but such construction was not necessary for its implementation (Gov't Ex. L–3; Tr. 564–5 (Bogolub); 976 (Watts)). Plan D, later considered by the Board, provided for modification of the Eisenhower, Roosevelt and Taft attendance zone boundaries (Tr. 761–2 (Watts)). Dr. Watts' recommendation that Plan C be adopted and implemented was based upon his opinion that establishment of the upper grade center at Coolidge would permit some improvement of curriculum for seventh and eighth grade students, within the same financial structure, and also permit alleviation of overcrowding at the Eisenhower School (Tr. 738–44, 749–50, 757–778, 977, 981 (Watts)). Dr. Watts' recommended use of Coolidge was based, in part, on the fact that it was the only school in District 151 large enough to house all seventh and eighth grade students (Tr.

978–9 (Watts); Gov't Ex. L–3). Plan C was educationally the most sound of the proposals considered (Tr. 738–44, 749–50, 757–778, 977, 981 (Watts). See also Tr. 1463–8, 1473–5 (Hannum); Tr. II 130–40, 207–11 (Coffin); Tr. II 745–8, 785–7 (Hubbard); Gov't Ex. L–3).

(37) During the period in which Plans A through D were considered, all Board members agreed in principle on the educational desirability of an upper grade center program (Tr. 780–1 (Watts)). The approval of Plan D in February of 1968 was rescinded later in February (Tr. 764 (Watts)). A substantial factor in the Board's failure to adopt Plan C was the members' reflection of the community sentiment hostile to the desegregation which would result from that Plan (Tr. 530–36 (Bogolub); Tr. 783–5, 796, 798–800 (Watts); Gov't Exs. 0–3(a), pp. 44–49 (Graf); 0–8(a), pp. 34–43 (McGee). See also Tr. 192–3 (Kingsland); Tr. 377–86 (Watkins); Tr. 510–7, 521–23, 571–73 (Bogolub); Tr. 747–9, 785–6, 963–4 (Watts); Tr. 1104–9 (Wiersma); Tr. 1368–71 (Graf); Tr. II 2052–3, 2057–8 (Graf); Gov't Exs. 0–2(a), pp. 13–19, 23–26 (Graf); 0–3 (a), pp. 27–35 (Graf); 0–6(a) (Watts); 0–7(a), pp. 10–12 (Watts); F–6, pp. 19, 21–2, GGG; V).

(38) The principal purpose of the decisions of the defendants with respect to the educational structure of District 151 was to segregate the students on the basis of race and color; and that was the effect.

### Policies and Practices Regarding Student Assignment

(39) As a result of the actions of the defendants and their predecessors specified in paragraphs 16 through 38, public school students in District 151 have been segregated on account of race. As a result of these actions, the Coolidge and Kennedy Schools have been established and are identifiable as "Negro" schools, because of the racial composition of their student bodies, and the Roosevelt, Madison, Eisenhower and Taft Schools have, because of the racial composition of their student bodies, become established and identifiable as "white" schools.

### Safety and Convenience of Parents and Students

(40) The Court finds, upon the basis of the evidence summarized in Findings 41 through 48, that in School District 151, having an area of approximately 4.5 square miles, neither the method of student assignment in effect during the 1968–69 school year, nor the level of school bus transportation, has caused, or need cause in the future, any unusual problems of safety or inconvenience for parents or students (Finding 1; See also Gov't Ex. HHH; Tr. II 94–5, 101–14, 189–97 (Coffin)).

(41) The preponderance of the credible evidence is that transporting to school by bus children in grades kindergarten to eight has no educationally detrimental effect (Tr. II 101–7, 113–4, 189–90, 99–100 (Coffin); Gov't Ex. HHH; Tr. II 241–3 (Crarey)), and that children who go to school by bus may be safer, and less exposed to weather conditions than children who walk (Tr. II 106, 113 (Coffin); Tr. II 244–5 (Crarey); Tr. II 1420–23 (Byrd); See also Gov't Ex. EEEE). White children in grades one through eight in District 151 have been bussed to the Roosevelt School since at least the 1960–61 school year (Gov't Ex. E–2, 17–21), and to the Taft School since it opened for the 1966–67 school year (Finding 3; Gov't Ex. E–8, pp. 9–15). White kindergarten children have been bussed to the Taft and Roosevelt Schools in District 151 since the start of the 1966–67 school year (Gov't Ex. E–8), when kindergarten classes were first offered in the District (Gov't Exs. A–16, A–17). There was no evidence that bussing has had any detrimental effect on any of the white children, referred to in Findings 16 through 19, transported to school by bus in District 151 prior to or during the 1968–69 school year.

(42) In transporting children in District 151 to school by bus from the 1940's to the present, and other children to schools in neighboring districts from

prior to 1940 to the present, the Van Der Aa Brothers Bus Company has experienced few accidents, and student-riders no serious injuries (Tr. II 378–81, 383–5, 403 (Van Der Aa)). During the 1968–69 school year, the Van Der Aa Company operates 68 buses and transports approximately 10 to 12 thousand students per day to the schools which it serves (Tr. II 378–80 (Van Der Aa)). Considering this experience, and Finding 41, and the fact that of those students transported to school by bus during the 1968–69 school year who would have walked to school under the attendance plan in effect during the 1967–68 school year, most would have crossed one or more streets in walking to school, some of which are heavily travelled (Gov't Exs. P–4; Tr. II 113 (Coffin); EE, Tr. II 405 (Van Der Aa)), the Court finds no evidence of any additional safety problems resulting from the transportation of additional students in District 151 during the 1968–69 school year.

(43) Since the beginning of the 1968–69 school year, there has been no problem of lateness of the school buses serving District 151 (Tr. II 399–400 (Van Der Aa); Tr. II 242–3 (Crarey); Tr. II 428 (Gray)). The confusion in school bus transportation service at the beginning of the 1968–69 school year could have been avoided, and can be avoided in future years, if lists of students to be transported are furnished the bus company earlier than they were for the 1968–69 school year, as is normally done (Tr. II 398–9 (Van Der Aa)). There is some evidence that school bus transportation can improve tardiness problems (Tr. II 190 (Coffin)), and that it has among Phoenix students attending the Roosevelt School in 1968–69, compared to previous years at Coolidge and Kennedy (Tr. II 428–9 (Gray)).

(44) Discipline problems are no greater at Coolidge in 1968–69 than during 1967–68 (Tr. II 260 (Crarey)). While there was some evidence that discipline problems at the Madison School are greater during 1968–69 than 1967–68 (Tr. II 1154 (Schmidt)), and greater at Taft School during 1968–69 than at Eisenhower School during 1967–68 (Tr. II 1245–6, 1259 (Hamilton)), the evidence does not establish that systemwide in District 151 discipline problems are any greater in volume in 1968–69 than 1967–68.

(45) Many school districts have "sack lunch" programs (Tr. II 111–13 (Coffin); Tr. II 1028–9 (Kuster)), such as exists in School District 151. District 151 schools do not have specially designed lunch rooms or cafeterias (Tr. II 434–5 (Gray); Tr. II 1176–8 (Schmidt); Tr. II 1243–4 (Hamilton)). The lunch program in District 151 in 1968–69 is similar to the lunch program in effect before 1968–69 for students who ate at school (Tr. II 1176–8 (Schmidt); Tr. II 1270–1 (Hamilton)).

(46) Parent participation in the Coolidge PTA is better in 1968–69 than it was during 1967–68, and the level of participation by white and non-white parents is relatively about the same (Tr. II 257–8 (Crarey)). There was some evidence that participation of Phoenix parents in the Roosevelt School PTA is relatively slightly less this year than it was in prior years at the Coolidge and Kennedy Schools (Tr. 433–4 (Gray)), and that a relatively small number of parents from Phoenix are participating in the PTA programs at the Madison and Taft Schools during 1968–69 (Tr. II 1162 (Schmidt); Tr. II 1258 (Hamilton)). Meetings of PTA's for the schools located outside of Phoenix could periodically be scheduled at the Coolidge or Kennedy Schools to encourage participation by Phoenix parents (Tr. 110–11 (Coffin)).

(47) In one class, participation of Phoenix parents in the first parent-teacher conference at the Roosevelt School during 1968–69 was relatively somewhat less than at Coolidge and Kennedy during previous years (Tr. 430–1 (Gray)). It would be feasible to schedule some parent-teacher conferences for parents of Phoenix children attending the Taft, Roosevelt, Eisenhower and Madison Schools at the Coolidge and

Kennedy Schools to facilitate additional participation by Phoenix parents (Tr. 431-3 (Gray)).

(48) No showing was made that during the 1968-69 school year there is any problem in sending children home during the school day because of illness, different from or greater than in previous years under the previous system of student assignment; inability to contact parents and other designated persons, not distance of homes from schools, has been the basis of problems experienced (Tr. II 1202-3 (Schmidt); Tr. II 1418-19 (Byrd); Tr. II 1745-51 (Ford); Tr. II 435-6 (Gray)). The evidence does not establish that prior to or during the 1968-69 school year there has been a problem in District 151 in sending home during the school day because of illness, or the soiling of clothes, the white children, referred to in Findings 18-18, who were bussed to the Taft and Roosevelt Schools.

### Present Structure of System

(49) The curriculum for seventh and eighth grade students in School District 151 during the 1968-69 school year is improved in the areas of French, art and music, compared with 1967-68 (Tr. II 251 (Crarey); Tr. II 1120-1, 1133 (Brown); Tr. II 1989-91 (McGovern); Tr. II 2321-2 (Van Dam)). The science room at the Coolidge School was destroyed by fire in March or April of 1968 (Tr. II 2134 (Weirsma)). Upon completion of the rehabilitation of this room, it will be superior in terms of facilities and equipment to all other science rooms in District 151 (Tr. II 2314 (Van Dam); Tr. II 2134-5, 2159 (Weirsma)). It would be comparatively more difficult for all seventh and eighth grade students in District 151 to use this facility if they were distributed among five separate attendance centers (Tr. II 1008-9 (Kuster); Tr. II 1706-7 (Olmsted)). Completion of this room has been delayed several times during the 1968-69 school year (Tr. II 1993 (McGovern); Tr. II 2135 (Weirsma)). The library materials for seventh and eighth grade students were consolidated at the Coolidge School

for the 1968-69 school year (Tr. II 1134 (Brown); Tr. II 1217-8 (Koelikamp)).

(50) In the future, District 151 will be able to make improvements in the curriculum for seventh and eighth grade students and the educational materials, including library materials, available for those grades more efficiently and economically because all students in these grades are attending the Coolidge Upper Grade Center instead of five separate attendance centers (Tr. II 745-8, 785-7 (Hubbard); Tr. II 140 (Coffin); Tr. II 269-70 (Crarey); Tr. II 1706, 1709-11 (Olmsted); Tr. II 2315-7 (Van Dam)). If at some future time, District 151 constructs a building specially designed for an upper grade center, the transition to a program at that school will be easier because a program has been commenced at the Coolidge School (Tr. II 1038 (Kuster); Tr. II 1711-12 (Olmsted)).

(51) On the basis of the comparison of the programs offered seventh and eighth grade students in District 151 during the 1967-68 and 1968-69 school years (Finding 49), the comparative advantages in making further improvements in the educational program for seventh and eighth graders because of the reorganization (Finding 50) and the weight of expert opinion to the effect that operation of an upper grade center program, contrasted to the dispersal of such students at five separate schools, is desirable in terms of both economic and educational factors (Tr. 1463-6, 1473-5 (Hannum); Tr. II 130-140, 207-11 (Coffin); Tr. II 963-5, 1006-7, 1076 (Kuster); Tr. II 1689-90, 1706, 1709-11 (Olmsted); Tr. II 745-8, 785-7 (Hubbard); Gov't Ex. H-1, pp. 9-10), the Court finds that the operation of the Coolidge Upper Grade Center has been educationally of benefit to School District 151.

(52) The Coolidge School has 25 regular classrooms, two basement rooms and a gymnasium (Gov't Ex. L-3, pp. 4-5). The Taft School, the next largest facility in the District, has 21 classrooms, two of which are specially designed for kinder-

garten purposes, and a gymnasium (Gov't Ex. L–3). The Coolidge School is the only facility in School District 151 large enough to house the type of program for seventh and eighth grade students being conducted at that school during the 1968–69 school year, without the addition of portable classrooms (Tr. II 249 (Crarey); Tr. 11 2313–4 (Van Dam)). The Coolidge School building is not an ideal one for an upper grade center program because it does not have certain special facilities designed for such a program (Tr. II 2250–52, 2256 (Van Dam)). Such special facilities generally do not exist in District 151 (Tr. II 1999–2010 (McGovern); Tr. II 2314–21 (Van Dam); Tr. II 2546–55 (Golden); Gov't Exs. AAAA–25–7, 29–40). A leaky roof at the Taft School has been a continuing problem since that school opened (Tr. II 2049–50 (Fox); Tr. II 1268–69 (Hamilton)). The Coolidge School physical facility was considered "adequate and suitable" for a junior high school program by Robert G. Hayes, Assistant Cook County Superintendent of Schools (Tr. II 2365–72 (Hayes); Gov't Exs. CCCC–1, p. 2). Mr. Hayes is in charge of school building inspections for the suburban area of Cook County, including the program for determining the "adequacy and efficiency" of school facilities under Sec. 3–14.21 of the Illinois School Code (Tr. II 2342–44). In view of the total student enrollment in District 151, the number of available classrooms in the six schools, and the number of teachers, it would be necessary to use the Coolidge School at the present time regardless of the pattern of school organization in District 151 (Gov't Exs. L–3; CC, p. 1; DD).

(53) The Court finds no basis for the statement "The District has had to spend $38,000 beyond its personnel budget to hire the extra teachers needed to move the upper grade center—twenty-four classroom teachers, an Assistant Principal, a Counselor and Principal (27 teachers)" in the Report dated September 9, 1968, prepared by Superintendent Van Dam, and submitted to the Court (Gov't Ex. EEE, p. 2). A comparison in corresponding budget categories (502.11, 502.12, 502.13, 502.17 and 503.1) of the amount allocated for faculty and staff in the working papers of Superintendent Van Dam prepared in November of 1968 (Gov't Ex. KK, pp. 1, 4–5) and the defendants' Answer Two to interrogatories submitted in December of 1968 (Gov't Ex. FFF, 28–34) with the amounts allocated in the District 151 budget adopted on July 8, 1968, two weeks before the Court directed implementation of portions of "Plan C" (Gov't Exs. AAA, pp. 41, 45; JJ, pp. 1, 4–5) shows increased expenditures of approximately $13,400, as of the preparation of the later documents. A portion of this increase resulted from increasing on September 23, 1968, by about $2,000 a principal's salary (Gov't Exs. F–8, p. 39; AAA, pp. 111, 113), and the hiring on December 4, 1968, of a Title I librarian for the Coolidge School at a salary of $4,608 (Gov't Ex. FFF, p. 29), neither of which actions was required by the Court order of July 22, 1968. The Court finds that the remaining amount is not attributable to the Court order of July 22, 1968, based upon the following facts:

(A) The July 22 order required no specific number of faculty and staff members at Coolidge, and more particularly did not require that the Coolidge School operate with a pupil-teacher ratio of 1/23.7 to which the September 9 Report refers (Gov't Ex. EEE, p. 2).

(B) The evidence shows that through August 16, 1968, it was consistently planned to implement the July 22 order within the limitations established by the budget adopted on July 8, 1968, with a staff of 25 at Coolidge (Gov't Exs. AA, p. 84; AAA, pp. 9–10; BBB, pp. 7–8; CCC, pp. 4–5), and that subsequent to August 16, 1968, about seven teachers were employed for Coolidge (FFF, p. 29).

(54) Prior to the filing of this action there were serious limitations in the educational program offered in School District 151 (Tr. 811–814 (Watts)). Par-

ticular problems existed in the program for the upper grades of the system (Tr. 742–3 (Watts)).

### Financial Aspects

(55) Many school districts in Illinois are experiencing financial problems with respect to their Educational Funds because of the relative inadequacy of sources of additional revenue, compared with increasing costs (Tr. II 743–44, 773–5 (Hubbard)). School District 151 was experiencing such problems prior to the entry of this Court's orders of July 8 and July 22, 1968 (Tr. 809–813 (Watts)).

(56) District 151 will lose a total of approximately $70,000 in general state assistance to its Educational Fund in the period from January 1969 through July of 1969, as a result of a loss of enrollment and average attendance at the start of the 1968–69 school year (Tr. II 1471–6 (Wyandt); Tr. II 732 (Hubbard); Gov't Ex. WW). In an application for financial assistance under Title V of the National Defense Education Act, Superintendent Van Dam wrote the following with respect to the loss of enrollment: "The fact is that the district has lost about $88,000 in ADA because of the integration—parents not wanting to integrate, transferred over 300 children out of the district" (Gov't Ex. NN, p. 6; Tr. II 1475). The Court concludes, based upon this statement, the evidence of community hostility to desegregation (Gov't Exs. GGG, V; F–3, pp. 14, 16, 18–19; O–2(a), pp. 7–9, 11–12, 13–19, 23–26 (Graf); O–3(a), pp. 44–49 (Graf); O–6 (a) (Watts); O–7(a), pp. 10–12 (Watts); Tr. 370–1, 386 (Watkins); Tr. 510–7, 530–6 (Bogolub); Tr. 783–5, 791–2, 795, 796, 798–800 (Watts); 1104–9 (Weirsma); 1368–71 (Graf); Tr. II 1263–4, 1327–8, 1340–1 (Hamilton)), and the many transfers to parochial schools (Gov't Exs. FFF, pp. 9–26; VV), that a significant portion of the loss of enrollment of about 180 students in District 151 from the end of the 1967–68 school year to December of 1969 (Gov't Ex. CC, pp. 1, 4), resulting in the loss of state aid mentioned above, was based upon community hostility to the desegregation resulting from the Court's orders of July 8 and 22, 1968.

(57) Such problems as District 151 may experience during 1969 or 1970 with respect to the financial position of its Educational Fund would have been delayed less than one month had the $70,000 in state assistance, referred to in Finding 56, not been lost (Tr. II 1476 (Wyandt)). The evidence establishes no Educational Fund expenditure required for implementation of the Order of July 22, 1968, during the 1968–69 school year, greater than would have been necessary under the previous pattern of school organization (See Finding 53).

(58) The defendants presented at the trial testimony of two witnesses, Owen Wyandt, Treasurer for the schools of Thornton Township, including District 151, and G. Alvin Wilson, and an exhibit, relating to the position of the District 151 Education Fund as of approximately March 1, 1970, about 13 months after their testimony (Tr. II 1460–2 (Wyandt); Tr. II 1607–8 (Wilson); D Ex. 64). The evidence, including the testimony of Dr. Ben Hubbard, advisor to the Illinois School Problems Commission, and an expert on Illinois School finance law (Tr. II 503, 495–501 (Hubbard); Gov't Ex. QQQ), establishes that such projections involve considerable speculation because of the large number of variables which will ultimately determine the Educational Fund's position as of that time (Tr. II 764–6, 768 (Hubbard); Tr. II 1472, 1493 (Wyandt)). These include the following:

(A) Whether the District's assessed valuation to be determined in about March of 1969 and March of 1970 increases at the average rate of the past five years, 5.5 percent (Tr. II 1494, 1508–9 (Wyandt)).

(B) An increase in the amount of general state assistance to District 151 in the period commencing in August, 1969, including an increase in the level of state assistance (Tr. 703, 732, 775 (Hubbard); Tr. II 1472–3 (Wyandt); Gov't Ex. WW).

(C) The passage of one, two or three referenda providing for twenty-one cent increases in the educational tax rate of District 151 (Tr. II 2230–32 (Van Dam); Tr. II 1462 (Wyandt)).

(D) Enrollment in September of 1969 (Tr. II 732–3 (Hubbard)).

(E) Adjustments in the level of Educational Fund expenditures for the period starting July 1, 1969, the next budget year, resulting from decreased enrollment in District 151 or otherwise (Tr. II 741–2 (Hubbard); Tr. II 979–80 (Kuster); Tr. II (Wyandt); Gov't Ex. JJ, p. 1).

The Court finds its conclusion as to the speculative nature of such projections buttressed by the varying figures utilized by defendants' two witnesses, Messrs. Wyandt and Wilson, including the level of expenditures (Tr. II 1487–8, 1524 (Wyandt); D Ex. 64), assessed valuation (Tr. II 1448, 1522 (Wyandt); Tr. II 1627 (Wilson)), monthly state assistance (Tr. II 1523 (Wyandt); D Ex. 64, p. 2), and the extent of the District's ability to secure revenue by use of tax anticipation warrants (Tr. II 1447, 1459 (Wyandt); Tr. II 1475–6 (Wilson)).

(59) The Court finds, upon the basis of the following evidence, that District 151 will have adequate Educational Fund revenue to operate through the end of the present budget year, June 30, 1969.

(A) Owen Wyandt and G. Alvin Wilson testified on behalf of the defendants that based upon projected Education Fund revenues and expenditures through the end of the present budget year on June 30, 1969, the Educational Fund would have on June 30 a deficit of $15,-000 or $37,000, respectively (Tr. II 1451–2, 1492 (Wyandt); Tr. II 1599 (Wilson); D Ex. 64).

(B) Based upon the experience of District 151 during the 1966–67 and 1967–68 budget years, with respect to the receipt of Educational Fund income in categories other than current and back taxes, from the sale of tax anticipation warrants against the current educational tax levy and general state assistance (Gov't Exs. GG, pp. 10–11; HH, pp. 10–11; Tr. II 1480–2 (Wyandt)), compared with the experience in 1968–69 to December 31, 1968 (Gov't Exs. JJ, pp. 2–4; PP, pp. 5–7; Tr. II 1479–86), each witness underestimated the receipt of such other categories of income (hereinafter referred to as miscellaneous income) through the end of the present budget year (Mr. Wyandt: Tr. II 1477–79, 1487, 1489, 1546–9; Mr. Wilson: Tr. II 1579, 1580, 1582, 1613–22; D Ex. 64), Mr. Wyandt including no miscellaneous revenue in his projection (Tr. II 1477–79, 1487 (Wyandt)). Based upon the method which he utilized, Mr. Wilson overestimated Education Fund expenditures through the end of the current budget year by about $22,000 (Tr. II 1579, 1623–5 (Wilson)); Gov't Exs. PPP, pp. 9, 12, 15; PP, p. 1).

(C) Even if the projections of the witnesses prove accurate, District 151 could secure sufficient revenue to operate through the current budget year by making the 1969 Educational Fund tax levy in June of 1969 and making a loan against it (Tr. II 704–5, 727–9 (Hubbard); Tr. II 1453 (Wyandt)). This technique was used to a greater degree during the 1966–67 budget year (Gov't Ex. GG, p. 28; Tr. II 1488 (Wyandt)) than it would have to be in June of 1969, if the projections showing a deficit are correct. In excess of $300,000 could be secured by use of this technique (Tr. II 1523 (Wyandt)). Considering corrections with respect to miscellaneous income and the level of expenditures to the end of the present budget year, it appears probable that there will be adequate Educational Fund revenue for the District to operate through the end of the 1968–69 budget year, without borrowing against the 1969 educational tax levy (Tr. II 1487 (Wyandt); Tr. II 1625 (Wilson)).

(60) The Court finds, upon the basis of the following evidence, that it appears that School District 151 will have adequate Educational Fund revenue to operate through June 30, 1970, and that it is

not presently feasible to make a projection beyond that date.

(A) The defendants presented the testimony of Mr. Owen Wyandt and Mr. G. Alvin Wilson and documentary evidence to the effect that as of about March 1, 1970, School District 151 would have insufficient revenue to meet further necessary Educational Fund expenditures (Tr. II 1460–2 (Wyandt); 1607–8 (Wilson); D Ex. 64). For the reasons specified in Finding 58, the Court finds that such projections are highly speculative. Mr. Wyandt and Mr. Wilson employed a number of different figures in their projections (Finding 58). The Court finds the projection of Mr. Wyandt more reliable because of his greater experience with School District 151 and other area districts (Tr. II 1441–3 (Wyandt); 1554, 1556, 1585, 1608–9, 1634–5, 1629 (Wilson)), and because of apparent errors made by Mr. Wilson in applying the techniques to which he testified (Tr. II 1579, 1623–5, 1635–7, 1613–22 (Wilson); Gov't Exs. PPP, pp. 9, 12, 15; PP, p. 1).

(B) Mr. Wyandt's projections did not include receipt of any miscellaneous income for the period from the date of his testimony to March 1, 1970 (Tr. II 1477–79, 1487, 1488 (Wyandt)). Based upon District 151's special education program in 1968–69 (Gov't Ex. IIII), about $60,000 in miscellaneous income should be received during the 1969–70 budget year in reimbursement from the State of Illinois under the statutory formula specified in the Illinois School Code, Ch. 122, Sec. 14–13.01 (Tr. II 763–4 (Hubbard); Tr. II 2292 (Van Dam)). District 151 received the following approximate amounts in categories of miscellaneous income other than special education reimbursement for the Educational Fund in the periods indicated: $103,000 during the 1966–67 budget year (Gov't Ex. GG, pp. 10–11); $74,000 during the 1967–68 budget year (Gov't Ex. HH, pp. 10–11); $56,000 during the 1968–69 budget year through December 31, 1968 (Gov't Ex. PP, pp. 5–7). Mr. Wyandt did not allow for increased assessed valuation in March of 1970 and March of 1971, despite the average yearly increase of 5.5 percent for the last five years (Tr. II 1494, 1508–9, 1448, 1522 (Wyandt)). Mr. Wyandt's estimate for general state assistance in the period from August 1969 through February of 1970 appears about $3,000 per month too low, since the figure of about $43,200 per month includes an adjustment for over-payment during the first five months of 1968–69 (Tr. II 732 (Hubbard); 1470–1, 1523 (Wyandt), Gov't Ex. WW).

(C) Allowing for adjustments in the above categories, and by advancing the time of the 1970 educational tax levy (Tr. 704–5, 727–9 (Hubbard); Tr. II 1453, 1525 (Wyandt)), it appears that District 151 will have adequate Educational Fund revenue to operate through the end of the 1969–70 budget year, June 30, 1970, even if the Educational Fund's financial position is not further improved by the occurrence of other events referred to in Finding 58. A more realistic miscellaneous income figure (Tr. II 1613–22 (Wilson); D Ex. 64) and a correction in expenditure level (Tr. II 1579, 1623–5, 1635–7 (Wilson); Gov't Exs. PPP, pp. 9, 12, 15; PP, p. 1) make this conclusion applicable to Mr. Wilson's analysis. In view of the factors listed in Finding 58, it is not, at this time, feasible to make a projection beyond June 30, 1970.

(61) Based upon projected additional expenditures and available revenues, to the end of the current budget year on June 30, 1969, the District 151 Building Fund will on June 30, 1969, be in a better financial position than it was on June 30, 1967, and in relatively the same position as it was on June 30, 1968 (Tr. II 1514–21 (Wyandt); Gov't Exs. GG, p. 8; HH, p. 8; JJ, p. 1). The Building Fund would be in a relatively good financial position on June 30, 1969, considering the amount of uncollected 1968 taxes upon which the foregoing analysis is based (Tr. II 711–2 (Hubbard); Tr. II 1520–1 (Wyandt)).

(62) The Court finds that it will not be necessary to use any Educational

Fund revenue to pay transportation costs in District 151 during the 1968-69 school year, and that none of the funds thus far utilized for transportation costs, or to be utilized for such costs, could have been, or could be, used for other purposes. As of January 31, 1969, about $19,400 had been paid of the total 1968–69 cost of transporting regular and special education students, about $48,000 (Gov't Exs. ZZ; OOO; PP, pp. 2, 4; PPP, pp. 13, 16; Tr. II 1464 (Wyandt)). As of January 31, 1969, projected available revenue through the end of the budget year was about $31,000 (Tr. II 1464, 1466–7 (Wyandt)). As much as $3,500 more could become available, depending on assessed valuation in about March of 1969 (Tr. II 1466, 1494, 1508–9), receipt of additional 1967 taxes (Tr. II 1443, 1464–6 (Wyandt)) and a deficiency payment for the 1967–68 special education transportation claim (Tr. II 1480–2, 1496 (Wyandt)).

(63) Pursuant to a request by the defendant Superintendent, dated December 9, 1968, officials of the Division of Equal Educational Opportunities of the United States Office of Education assembled a group of educational specialists for the purpose of studying the operation of School District 151 and preparing for submission to the Board of Education a plan of desegregation within the framework of the District's existing facilities (Gov't Ex. RRR, p. 1; Tr. II 546–549 (Johnson)). These specialists in education and plans of school desegregation visited and studied the School District in December of 1968 and January of 1969, and the expert in charge of the group testified to the effect that they had adequate time and information to prepare the most suitable plan of desegregation for District 151 (Gov't Ex. RRR, pp. 1–2; Tr. II 585–586 (Johnson)).

Two plans of desegregation were presented to the defendants on January 16, 1969 (Tr. II 588 (Johnson)). Both plans took into account all factors deemed relevant to the inquiry, including some study of the plans' financial implications for the District (Tr. II 582 (Johnson); Gov't Ex. RRR, p. 16), but neither plan involved a detailed analysis of the District's financial resources (Tr. II 559, 560–585 (Johnson)).

The representatives of the United States Office of Education recommended the adoption of either variation of Plan I as the plan of desegregation educationally most sound within the District's existing facilities and resources (Gov't Ex. RRR, p. 15; Tr. II 569, 588 (Johnson)). That plan, briefly, would utilize the Coolidge/Kennedy School complex as a middle school for all pupils in grades six, seven, and eight, while the District's children in grades kindergarten through five, including children residing in the Village of Phoenix, would attend the Roosevelt, Madison, Taft and Eisenhower Schools (Gov't Ex. RRR, pp. 3–8; Tr. II 569–570 (Johnson)).

Although the record is not explicit at any one place, viewed overall it compels the inference that the defendant school officials are unwilling voluntarily to adopt either of the plans tendered pursuant to their request.

(64) The Coolidge and Kennedy Schools have a total of 37 rooms not including two basement rooms at Coolidge (Gov't Ex. L–3). These schools would be large enough to house all sixth, seventh and eighth grade students in School District 151 during the 1969–70 school year (Gov't Exs. CC, p. 1; DD; RRR). The Eisenhower, Madison, Roosevelt and Taft Schools could accommodate all kindergarten through fifth grade students in District 151 during the 1969–70 school year (Gov't Exs. L–3, pp. 4–5; CC, p. 1; DD; RRR). The facilities of the Kennedy School, including its gymnasium, are adequate for use by sixth, seventh and eighth grade students (Tr. II 294–5 (Crarey); Tr. II 1992 (McGovern); Tr. II 575 (Johnson); Tr. II 1417 (Byrd); Tr. II 2269–71 (Van Dam); Gov't Exs. AAAA 13–23).

(65) Upon the basis of the evidence to the effect that it is educationally sound to assign all sixth, seventh and eighth grade students to one campus in a school

district, contrasted to assigning them to five different schools (Tr. II 130–4 (Coffin); Gov't Ex. H–1, pp. 9–11; See also Finding 51), the evidence that offering an upper grade program at one location in a school district instead of five results in the providing of more education per dollar spent (Tr. 771–2 (Watts); Tr. 1466–67, 1473–5 (Hannum); Tr. II 140 (Coffin); Tr. II 1706, 1709–11 (Olmsted); Tr. II 745–8, 785–7 (Hubbard)), the experience of District 151 with respect to improved curriculum in grades seven and eight after the reorganization of the system for the 1968–69 school year (Finding 49), and the evidence that additional improvements in the educational program are more economically accomplished after consolidation such as occurred in District 151 for the 1968–69 school year (Finding 50), the Court finds that the implementation of the Office of Education proposal designated "Plan I" in School District 151 (Gov't Ex. RRR, p. 3) would be educationally sound.

(66) The evidence does not establish that the implementation in 1969–70 of the Office of Education "Plan I", summarized in Finding 63, would involve any greater Educational Fund expenditure for the educational program than would be necessary under the pattern of school organization in effect during 1968–69, except for the cost of moving desks and other materials (Tr. II 583–4). Furthermore, under each alternative of "Plan I" presented by the Office of Education, some reduction in staff might result in savings in the Educational Fund (Gov't Ex. RR, p. 16). Implementation of "Plan I" would involve additional transportation costs (Gov't Ex. RR, p. 16), and might involve an expenditure of about $7000 or $8000 from the Building Fund (Tr. II 2047–8 (Fox); Tr. II 294–5 (Crarey); Tr. II 1992 (McGovern)).

(67) Implementation of "Plan I" (Finding 63) would involve additional school bus transportation in 1969–70. Kennedy students grades kindergarten through two would be transported by bus to schools outside of Phoenix, and sixth grade students, other than those from Phoenix, would be transported to Coolidge-Kennedy. Sixth grade students from Phoenix, transported in 1968–69, would not be in 1969–70 (Gov't Ex. RRR).

Some bus routes operating in School District 151 during the 1968–69 year have excess capacity (Gov't Ex. FFFF). The six routes serving the Coolidge School have about 118 empty seats (Gov't Ex. FFFF, p. 2). The six routes from Phoenix to Madison, Eisenhower, Roosevelt and Taft, and the two routes from the area east of Phoenix to Roosevelt, have a total of about 43 empty seats (Gov't Ex. FFFF, p. 3). In addition these routes now include about 72 sixth graders from Phoenix (Gov't Ex. 00, p. 2). Two routes in 1968–69 pick up children in more than one attendance area (Tr. II 2656–69 (Van Der Aa)), and routes for 1969–70 could be planned in a similar manner (Tr. II 2668–9, 2685–6 (Van Der Aa)).

In determining the number of additional routes that would be needed in 1969–70, it is appropriate to consider available seats on existing bus routes which could be used to transport additional children from the same areas (Tr. II 2669–73, 2684–5 (Van Der Aa)). It would appear on the basis of the facts now known that approximately 5 additional regular routes at a cost of about $12,500 would be needed (Tr. II 2655, 2677, 2683–9 (Van Der Aa); Gov't Exs. FFFF; CC, p. 1; P–4), together with about 2 midday routes for kindergarten children at a cost of about $3000 (CC, p. 1; NNN). Increases in the cost of service for present routes could result in a total cost of about $67,500 (Tr. II 2654 (Van Der Aa)). While for the reasons specified in Finding 58, it is presently difficult to project Transportation Fund revenue for 1969–70, it would presently appear that about $52,000 would be a fair estimate (Tr. II 1466–7, 1494, 1508–9 (Wyandt); Tr. II 2202 (Van Dam); Gov't Exs. ZZ; BBB, p. 5).

A transfer of revenue from the Educational Fund would be necessary to pay a deficit of about $15,500. Implementa-

tion of each alternate of "Plan I" contemplates some saving in personnel costs (Gov't Ex. RRR, p. 16). There is also some evidence that a portion of the District's federal assistance under Title I of the Elementary and Secondary Education Act could be used for transportation costs (Tr. II 587 (Johnson); Tr. II 2575–6; 2580–2 (Sullivan)). In the last three years Title I assistance for the District has been about $24,000, $40,000 and $29,000, respectively (Gov't Ex. GG, p. 10; HH, p. 10; and KK, p. 2). Accordingly it would appear that the District will have adequate revenue to meet the transportation costs under "Plan I."

### Credibility of Witnesses

(68) Certain statements and actions by witnesses for the defendants cast doubt, in the view of the Court, upon their credibility and, consequently, upon the weight to be accorded their testimony.

(A) Henry Ford, principal of the Roosevelt School, testified that a decision to employ additional personnel at the Coolidge School in the implementation of "Plan C" was made by Dr. Watts, in Mr. Ford's presence, in writing on the document introduced in evidence as Defendant's Exhibit 65, on July 1, 1968, after Dr. Watts received a telegram that the District's Title One program had been funded (Tr. II 1759–61, 1777–8, 1795–6, 1798, 1830 (Ford)). In fact, the date of July 1 was three weeks before this. Court ordered implementation of a portion of "Plan C" on July 22, 1968, the writing which Mr. Ford several times testified was done on July 1 by Dr. Watts was done by Superintendent Van Dam in the second week of September, 1968, at which time Mr. Ford was not present, the District's Title I application was not made until August 5, 1968, and Superintendent Van Dam had no knowledge of any telegram regarding Title I (Tr. II 2258–9, 2301–2304 (Van Dam)).

(B) On January 22, 1969, Hugh Crarey, then principal of the Coolidge Upper Grade Center, testified that at 7:00 a. m. on January 21, 1969, Dr. Thomas Van Dam telephoned him, and that during the conversation Dr. Van Dam said that Mr. Crarey should not meet a government attorney that day because, if the board should hear of it, he (Mr. Crarey) could be "nailed to the wall" (Tr. 236 (Crarey)). This testimony was not refuted by Dr. Van Dam despite the fact that he subsequently testified on February 7, 10, 11 and 12, 1969. In a report prepared for submission to this Court (Gov't Ex. EEE), Dr. Van Dam made a number of inaccurate statements regarding the transfer of children from School District 151 as a result of the Court's orders (Gov't Ex. EE, pp. 2–3; Tr. II 2426–35, 2447–51 (Van Dam)), alleged overcrowding at the Eisenhower School (Gov't Ex. EE, pp. 3, 4; CC, p. 4; A–18, p. 2; Tr. II 2442–2447 (Van Dam)), and the reason for the elimination of the position of assistant superintendent and curriculum coordinator in District 151 (Gov't Ex. EEE, p. 3; Tr. II 2435–39 (Van Dam)). While Dr. Van Dam attributed the elimination of these positions to the Court's order of July 22, 1968, the minutes of Board of Education meetings show that elimination of these positions was first discussed on February 5, 1968 (F–7, p. 148), initially undertaken on March 18, 1968 (F–8, pp. 39–40) and finally determined on May 6, 1968 (Gov't Ex. F–8, p. 8), more than two months before the order in question. The Court has also considered with respect to the credibility of Dr. Van Dam the evidence regarding the question of utilization of the Kennedy gymnasium by Coolidge students during the present school year, specified in Finding 71.

(C) Eugene Hamilton, Principal of the Taft School, testified that one factor in his opposing a junior high school program at the present time in School District 151 was community opposition to racial integration (Tr. II 1263–4, 1249–51, 1327–28 (Hamilton)).

### Permanent Relief

(69) On July 12, 1968, Board of Education member Gerald Bennett voted against a motion providing for compliance with the portion of this Court's

order of July 8, 1968, dealing with desegregation of faculty and staff (Gov't Ex. AA, pp. 47, 49). On July 22, 1968, Board member James Hendrix voted against a motion providing for implementation of this Court's order of July 22, 1968 (Gov't Ex. AA, pp. 60, 63). On September 23, 1968, Board members Gerald Bennett and Hannes Johnson voted against a motion providing for the raising of the transportation tax levy in District 151, and expenditures for transportation, as required by this Court's order of July 22, 1968 (Gov't Ex. AA, pp. 111, 114). In each instance, a majority of Board members supported the motion (Gov't Ex. AAA, pp. 49, 63, 114). Messrs. Bennett, Hendrix and Johnson were members of the Board of Education as of the trial (Finding 2).

(70) On November 4, 1968, the Board of Education of District 151 passed by a vote of 7 to 0 a motion providing "that the Superintendent prepare what is necessary for this system to revert back to its original state of K to 8 schools" (Gov't Ex. AA, pp. 145, 149). The plan prepared by the Superintendent pursuant to the motion provided for the attendance of all Negro children in School District 151 at the Coolidge and Kennedy Schools (Tr. II 81-3 (Van Dam); Gov't Ex. 00). The plan was not presented to the Board of Education on the advice of counsel (Tr. II 86 (Van Dam)). The plan was intended to go into effect during the school term, if a decision by the Court of Appeals resolving the appeal of this Court's orders of July 8 and 22, 1968, made such a plan of reversion an available option (Tr. II 91 (Van Dam); Tr. II 2121-3 (Johnson); Gov't Ex. 00, pp. 2-3). At the meeting on November 4 prior to the passage of the motion, there was no discussion regarding the educational desirability of such an action during the school year, and the Superintendent was not asked for a recommendation on this aspect of the matter (Tr. II 72-81 (Van Dam); Tr. II 2123-4 (Johnson); Gov't Ex. AA, pp. 145, 149). There is some evidence that the Board

member who introduced the motion on November 4 had previously inquired of the superintendent and assistant superintendent, in personal conversation, regarding the educational implications of a plan of reversion (Tr. II 2122-4 (Johnson); Compare Tr. II 72-81 (Van Dam)).

(71) During the 1967-68 school year, some students assigned to the Coolidge School had physical education classes in the gymnasium of the adjacent Kennedy School (Tr. II 294-5 (Crarey); Tr. II 1992 (McGovern)). During the course of the trial in this case, a revised schedule for the Coolidge Upper Grade Center was implemented (Tr. II 2187 (Van Dam)). This revised schedule provided for some Coolidge students having physical education classes at the Kennedy School (Tr. II 2264-5 (Van Dam)). Representatives of the State of Illinois had previously informed District 151 representatives that the physical education program for Coolidge students needed improvement (D Ex. 63, p. 4). The action of District representatives, including Superintendent Van Dam, in declining to permit Coolidge students to use the Kennedy gymnasium under the revised schedule was based at least in part on the view that this would undermine arguments made by the District in this litigation (Tr. II 2269-71, 2264-2276 (Van Dam); Tr. II 2038-39 (Fox); Tr. II 1936 (McGovern)).

(72) The defendants and their predecessors have engaged in racial discrimination in the operation of School District 151 of Cook County, Illinois.

(73) The entry of permanent injunctive relief is necessary to insure that Negro and white pupils will be free of racial discrimination in the operation of the schools of District 151, in violation of the Fourteenth Amendment to the United States Constitution and Title IV of the Civil Rights Act of 1964, and to prevent irreparable injury to the interest of the United States in securing equal protection of the laws through the orderly desegregation of public education.

228

## Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter of this action under Section 407 of the Civil Rights Act of 1964, 42 U.S.C. 2000c–6, and under 28 U.S.C. § 1345. United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125 (C.A. 7, 1968).

2. The requirements of the Fourteenth Amendment to the United States Constitution and Title IV of the Civil Rights Act of 1964 apply equally to all public school systems without regard to whether State or local law authorizes racial discrimination. Taylor v. Board of Education, 191 F.Supp. 181, 182–183 (S.D.N.Y.1961), affirmed, 294 F.2d 36 (C.A. 2, 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Clemons v. Board of Education, 228 F.2d 853, 859 (C.A. 6, 1956). United States v. School District 151, supra, 404 F.2d at 1130.

3. Pursuant to the Fourteenth Amendment and Title IV of the Civil Rights Act of 1964 this Court has jurisdiction to hear and decide all issues concerning alleged discrimination in public education in School District 151, including policies with respect to the assignment of students, the allocation of faculty and staff, the location and construction of schools, the transportation of pupils and the educational structure. United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5, 1966) affirmed en banc, 380 F.2d 385 (C.A. 5, 1967), cert. denied, Caddo Parish Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala., 1967), affirmed, Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

4. Recruitment and assignment of public school faculty and professional staff personnel, including principals, student and substitute teachers, and personnel who serve more than one school, on a racial basis, so as to establish schools that are racially identifiable by the composition of their faculties, deprives students of the right to be free of racial discrimination in the operation of the public schools, in violation of the Fourteenth Amendment. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Green v. County School Board of New Kent County, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). "Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color." Stell v. Board of Public Education for City of Savannah, 387 F.2d 486, 497 (C.A. 5, 1967).

5. " * * * (F)igures speak and when they do courts listen * * *." United States v. Board of Education of City of Bessemer, 396 F.2d 44, 46 (C.A. 5, 1968). The contemporaneous existence within one system, of some schools whose faculties and student bodies are almost exclusively white and other schools whose faculties and student bodies are almost exclusively Negro creates a presumption of discriminatory faculty assignments which requires the school authorities to demonstrate the constitutionality of their procedures. Chambers v. Hendersonville Board of Education, 364 F.2d 189, 192 (C.A. 4, 1966); State of Alabama v. United States, 304 F.2d 583, 586 (C.A. 5, 1962).

6. The policy and practice of the defendants and their predecessors of assigning Negro and white faculty and professional staff personnel, on the basis of race, to schools attended predominantly by students of the same race violates the Fourteenth Amendment. Kelley v. Altheimer, Arkansas Public School District No. 22, 378 F.2d 483, 498–499 (C.A. 8, 1967).

7. Defendants are obliged to pursue to completion the affirmative program of remedial action, begun pursuant to prior Order of this Court, to desegregate racially the faculty and professional staff

members of School District 151. Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690 (C.A. 5, 1968); Dowell v. School Board of Oklahoma City, 244 F.Supp. 971 (W.D.Okla., 1965), affirmed, 375 F.2d 158 (C.A. 10, 1967) cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Clark v. Board of Education, 369 F.2d 661 (C.A. 8, 1966).

■ 8. The defendants' present obligation, in order to overcome the effects of prior discrimination, is to allocate faculty and professional staff members so that no school is identifiable, by the racial composition of its faculty, as being tailored for a heavy concentration of Negro or white students. United States v. Jefferson County Board of Education, supra, 380 F.2d at 394; Brewer v. School Board of City of Norfolk, 397 F.2d 37, 39 (C.A. 4, 1968). That objective will be achieved when the racial composition of the faculty and staff at each school is approximately proportional to the racial composition of the system's entire faculty and staff at the same level or grades. Coppedge v. Franklin County Board of Education, 273 F.Supp. 289, 300–301 (E.D.N.C., 1967), affirmed, 394 F.2d 410 (C.A. 4, 1968); Dowell v. School Board of Oklahoma City, supra, 244 F. Supp. at 977–978; Kier v. County School Board of Augusta County, 249 F.Supp. 239 (W.D.Va., 1966); United States v. Greenwood Municipal Separate School District, 406 F.2d 1086, 1093–1094 (1969).

■■ 9. The responsibility for faculty and staff desegregation is that of the defendants, not the teachers, and the achievement of the required objective may not be made contingent upon the willingness of teachers voluntarily to transfer from their present schools. If necessary, faculty and professional staff members shall be assigned or reassigned to schools in order to comply with this requirement. United States v. Board of Education of City of Bessemer, 396 F.2d 44, 50–51 (C.A. 5, 1968); Davis v. Board of School Commissioners of Mobile County, supra; United States v. Greenwood Municipal Separate School District, supra; Monroe v. Commissioners of City of Jackson, 380 F.2d 955, 958–961 (C.A. 6, 1967), rev'd on other grounds, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Kelley v. Altheimer, supra, 378 F.2d at 498–499.

■ 10. This Court should consider, in determining whether there has been a violation of the Fourteenth Amendment, whether the defendants' series of educational policy decisions, which effectively resulted in a racially segregated public school system, were based wholly or in part upon considerations of the race of teachers and pupils. Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833, 837 et seq. (E.D. La., 1967), affirmed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 652, (E.D.La., 1961) affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1961); United States v. School District 151, supra, at p. 1134; Taylor v. Board of Education, 191 F. Supp. 181 (S.D.N.Y., 1961), affirmed, 294 F.2d 36 (C.A. 2, 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Griffin v. County School Board, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed. 2d 256 (1964).

■ 11. Plaintiff alleged and sought to prove that certain of the defendants' educational policy decisions which had an undisputed racial effect, i. e., the fixing of attendance zone lines, the transportation of pupils, the selection of sites for the Kennedy and Taft Schools, and the failure to adopt the upper grade center proposal in 1968, also were based, wholly or in part, upon a racial purpose, in violation of the Fourteenth Amendment. Defendants largely denied the allegation of racial purpose, and asserted that the decisions were based upon educational or other non-racial criteria, and that the segregation of pupils resulted innocently from factors beyond their control.

In assessing the relative merits of these conflicting contentions, the Court

may properly consider, in addition to such factors as the credibility of witnesses and the apparent availability of educationally sound and racially less exclusionary alternatives (Green v. County School Board, supra, 391 U.S. at 439, 88 S.Ct. 1689), the evidence with respect to the racially patterned allocation of faculty and staff during the pertinent period, over which the defendants and their predecessors undeniably had actual and legal control. Meredith v. Fair, 305 F.2d 343, 360 (C.A. 5, 1962), cert. denied, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed. 2d 66 (1962).

■ 12. Racial distinctions by public officials are uniquely repugnant to the Constitution. McLaughlin v. Florida, 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Therefore, standards and procedures pursuant to which pupils are assigned to schools, which are alleged to be racially discriminatory and which have resulted in exclusively white student bodies in regular classes in certain of a district's schools alongside almost exclusively Negro student bodies in the district's remaining schools, are subject to the most intensive judicial scrutiny and require the officials responsible to show that the standards and procedures challenged are based upon constitutionally permissible factors. Gomillion v. Lightfoot, 364 U.S. 339, 341–342, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Green v. County School Board, supra, 391 U.S. at p. 439, 88 S.Ct. 1689; Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 664 (C.A. 6, 1964); Brewer v. School Board of City of Norfolk, supra, 397 F.2d at 41; Evans v. Buchanan, 207 F.Supp. 820 (D. Del., 1962); Gautreux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill., decided February 10, 1969); Chambers v. Hendersonville City Board of Education, supra, 364 F.2d at 192.

■ 13. The intended and inevitable effect of the series of policy decisions by the defendants and their predecessors, made with respect to attendance zones, transportation of pupils, school site selection and construction, and or-ganization of the structure of the educational program, as described in the foregoing findings of fact, has been to preserve racial segregation of students in violation of the Fourteenth Amendment. Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Taylor v. Board of Education of City School District of City of New Rochelle, 294 F.2d 36 (C.A. 2, 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

■ 14. A school board may not, consistently with the Fourteenth Amendment, maintain segregated schools or permit educational choices to be influenced by a policy of racial segregation in order to accommodate community sentiment or the wishes of a majority of voters. Cooper v. Aaron, 358 U.S. 1, 13, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 659 (E.D.La.1961), affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1961); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Gautreux v. Chicago Housing Authority, supra, 296 F.Supp. 907; Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700 (1968).

■ 15. A school board may not, consistently with the Fourteenth Amendment, purposefully tailor the components of a neighborhood school attendance policy so as to conform to the racial composition of the neighborhoods in its school district. Taylor v. Board of Education, supra, 294 F.2d 36, 39.

■ 16. A school board may not, consistently with the Fourteenth Amendment, construct new schools or expand existing ones for the purpose and with the effect of creating or preserving racial segregation of pupils; nor may it select sites for new schools for the purpose and with the effect of incorporating in the school system existing

residential racial segregation; and school site selection is an appropriate subject of judicial relief. Kelley v. Altheimer, supra, 378 F.2d at pp. 496–497; Bivins v. Board of Public Education and Orphanage for Bibb County, 284 F.Supp. 888, 894 (M.D.Ga., 1967); United States v. Board of Public Instruction of Polk County, 395 F.2d 66 (C.A. 5, 1968); Lee v. Macon County Board of Education, 289 F.Supp. 975 (M.D.Ala., 1968).

17. An ostensibly neutral school attendance zone policy, which may be educationally justifiable in the circumstances of some school districts, is impermissible where it represents a policy by school authorities of building the effects of residential racial segregation into the school system. Henry v. Clarksdale School District, 409 F.2d 682, pp. 687, 689 (C.A. 5, decided March 6, 1969); Brewer v. School Board of City of Norfolk, 397 F.2d 37, 41–42 (C.A. 4, 1968).

18. A school board may not, consistently with the Fourteenth Amendment, bus pupils to schools for the purpose and with the effect of perpetuating or facilitating racial segregation of students; and transportation is an appropriate subject of relief. Lee v. Macon County Board of Education, supra, 267 F.Supp. 458, at 474; Kelley v. Altheimer, supra, 378 F.2d 483, at 497.

19. A school board may adopt or reject proposals with respect to the organization of the educational structure of a school system for educational or other reasons unrelated to race, but it may not constitutionally adopt or reject such proposals for the purpose and with the effect of perpetuating racial segregation of pupils; and the organization of the educational structure is an appropriate subject of relief. Hall v. St. Helena Parish School Board, supra, 197 F.Supp. at 652; Taylor v. Board of Education, 294 F.2d at 38–39; Green v. County School Board, supra, 391 U.S. at 442, 88 S.Ct. 1689, n. 6; Henry v. Clarksdale School District, supra, 409 F.

2d at p. 689; Raney v. Board of Education, 391 U.S. 443, 448, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).

20. The defendants' recurring assertion that the Village of Phoenix, of whose residents ninety-eight percent are Negroes, constitutes a "socio-economic" grouping distinct from the remainder of the District provides no educational justification for the segregation of pupils and teachers found in this case. Hobson v. Hansen, 269 F.Supp. 401 (D.D.C., 1967), affirmed, 408 F.2d 175 (D.C.Cir., decided January 21, 1969).

21. Racial desegregation of Negro and white pupils may present to school administrators educational or disciplinary problems that are the legacy of prior segregation. "Separate educational facilities are inherently unequal." Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). However, the asserted or actual existence of such problems does not lessen the constitutional obligation of school authorities, including the defendants here, to disestablish segregation of their systems. Stell v. Savannah-Chatham County Board of Public Education, 333 F.2d 55 (C.A. 5, 1964); same, 318 F.2d 425 (C.A. 5, 1963).

22. The opinion in 1966 of a non-lawyer in the Office of Education of the United States Department of Health, Education, and Welfare, to the effect that School District 151 was "de facto" segregated, which opinion was not adopted by senior officials of that Department, could not bind this Court. And in view of the comparatively (to the trials here) superficial inquiry upon which that opinion was based, it is not entitled to appreciable weight on this record. Cypress v. Newport News Hospital Ass'n., 375 F.2d 648, 659, n. 21 (C.A. 4, 1967); Singleton v. Jackson Municipal Separate School District, 355 F.2d 865, 869 (C.A. 6, 1966); Bowman v. County School Board, 382 F.2d 326, 328 (C.A. 4, 1967); Kemp v. Beasley, 352 F.2d 14, 19 (C.A. 8, 1965). Nor

does a similar finding in 1964 by the State Superintendent of Public Instruction bind this Court. Taylor v. Board of Education, supra, 294 F.2d 36, 39, n. 1.

23. The constitutional obligation of the defendants to operate a public school system that does not contravene the requirements of the Fourteenth Amendment may not be made contingent upon the financial capabilities of the School District. Constitutional rights may not be denied or abridged because their implementation will require the expenditure of public funds. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). A school district's financial resources are clearly relevant to the type of plan of desegregation to be required, and it is a factor that warrants careful consideration by the Court. United States v. School District 151, supra, 404 F.2d at 1135. Ultimately, however, public officials must " * * * exercise the power that is theirs * * * to raise funds adequate to * * * maintain without racial discrimination a public school system. * * *" Griffin v. County School Board, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964).

24. The present constitutional obligation of school authorities who have been found to have operated a racially segregated school system, in violation of the Fourteenth Amendment, " * * * is to come forward with a plan that promises realistically to work, and promises realistically to work *now.*" Green v. County School Board, supra, 391 U.S. at p. 439, 88 S.Ct. at p. 1694. All appropriate affirmative steps must be taken to correct the effects of prior racially discriminatory policies and practices with respect to the allocation of faculty and staff and assignment of students, so that "racial discrimination (is) eliminated root and branch." Green v. County School Board, supra, at p. 438, 88 S.Ct. at p. 1694; United States v.

Jefferson County Board of Education, supra, 372 F.2d at 889–890.

25. To the extent necessary to remedy the effects of past discrimination, as specified by the terms of this Court's Order, the defendants are required to give affirmative consideration to racial factors in allocating faculty and staff members, assigning students, and with respect to decisions on other pertinent matters of educational policy, including the location and construction of schools, transportation of pupils, and the educational structure of the District. Dowell v. Board of Education, supra; Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (C.A. 1, 1965); Offerman v. Nitkowski, 378 F.2d 22 (C.A. 2, 1967); Wanner v. Arlington County School Board, 357 F.2d 452, 454 (C.A. 4, 1966); Brooks v. Beto, 366 F.2d 1 (C.A. 5, 1966); United States v. Board of Public Instruction of Polk County, 395 F.2d 66, supra.

26. The foregoing requirement does not conflict with Illinois law; if it did, however, State law would yield to the requirement of the Constitution. Tometz v. Board of Education of Waukegan, Ill., 39 Ill.2d 593, 237 N.E.2d 498; United States Constitution, Article VI, cl. 2; United States v. School District 151, supra, 404 F.2d at 1135.

27. That provision of 42 U.S.C. Sec. 2000c–6 relating to the power of courts and officials to require transportation of pupils to overcome racial imbalance in public schools must be construed to relate to so-called de facto or adventitious segregation. It is inapplicable where, as here, the existing segregation of pupils and teachers is inseparable from the practices and policies of the defendants. United States v. Jefferson County Board of Education, supra, 372 F.2d 878–886; United States v. School District 151, supra, 404 F.2d at 1130.

28. It is the obligation of a district court to require the adoption of that plan which is best suited to achieving the objective of desegregation, or to

satisfy itself by careful inquiry that a school district's preference for a less likely alternative is based upon compelling and constitutionally permissible considerations. Green v. County School Board, supra, 391 U.S. at 439, 88 S.Ct. 1689; Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697 (1968); United States v. Greenwood Municipal Separate School District, supra, 406 F.2d 1086. The district courts have broad discretion in the fulfillment of the foregoing obligation. International Salt Company v. United States, 332 U.S. 392, 400–401, 68 S.Ct. 12, 92 L.Ed. 20 (1947); United States v. Crescent Amusement Company, 323 U.S. 173, 185, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Mitchell v. Robert DeMario Jewelry Co., 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1965).

 29. The constitutional prohibition against racial segregation applies to all levels of public education. Moreover, as set forth in the Findings of Fact, above, the adverse effects upon children of a racially segregated education are cumulative, so that desegregation in the lowest primary grades is an educational as well as a constitutional imperative. Therefore, the defendants' alternative proposals of October 30, 1968, with respect to the Kennedy School, are constitutionally unacceptable. Neither promises realistically to desegregate regular classes at that school, and freedom of transfer plans, which place the burden of desegregation upon parents and children, do not suffice where educationally sound, more promising alternatives are available. Monroe v. Board of Commissioners, supra, 391 U.S. at 459, 88 S.Ct. 1700; Adams v. Mathews, 403 F.2d 181 188 (C.A. 5, 1968); Henry v. Clarksdale School District, supra, 409 F.2d at 684, 685; Green v. County School Board, supra, 391 U.S. at pp. 437–438, 88 S.Ct. 1689.

30. As set forth more fully in the Findings of Fact, above, the defendants have not persuasively challenged the educational soundness or the economic feasibility of the plan of desegregation prepared, at their request, by the United States Office of Education. Moreover, although they are unwilling, on the present record, to adopt and implement that plan, they had not, as of February 12, 1969, inquired of the defendant Superintendent as to possible alternatives (Tr. II, 2477–2480, Van Dam) for presentation to this Court. These factors, considered together with votes by several Board members opposing, in effect, implementation of this Court's Orders of July 8 and 22, 1968, the unanimous tentative approval of the Board of a plan to return the former pupil attendance zones (without consideration by the Board as to the educational desirability of such a change during the school year), and uncontroverted testimony as to threatening language used by the defendant Superintendent toward an employee of the school system who was a witness for the plaintiff compel the conclusion that the defendants have not, as a matter of law, fulfilled the good faith performance requirement imposed upon them by the United States Court of Appeals for this Circuit. United States v. School District 151, supra, 404 F.2d at p. 1135. In any event, however, " * * * good faith does not excuse a board's noncompliance with its affirmative duty to liquidate the dual system. Good faith is relevant only as a necessary ingredient of an acceptable desegregation plan." Henry v. Clarksdale School District, supra, 409 F.2d at p. 684.

31. The longstanding pattern of discrimination by the defendants and their predecessors, in the face of the clear mandate of Brown v. Board of Education, supra, would alone warrant the granting of permanent relief, as would the considerations recited in the preceding paragraph, on this record. Taken together they impel this Court to require the defendants to adopt and implement that plan of desegregation which, in light of currently existing circumstances and facilities, is economically feasible and educationally consistent with the proper operation of the school system as a whole. United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894,

97 L.Ed. 1303 (1953); Porter v. Warner Holding Company, 328 U.S. 395, 397–398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Green v. County School Board, supra, 391 U.S. at p. 438, 88 S.Ct. 1689 n. 4; Kelley v. Altheimer, supra, 378 F.2d at 488–491. Of course, this Court's retention of jurisdiction is for all purposes, including the right of the parties to submit, by proper procedures, motions, evidence, and other relevant materials with respect to alternative plans, modifications of the plan ordered herewith, and supplemental relief. Raney v. Board of Education, supra, 391 U.S. at 449, 88 S.Ct. 1697.

32. The requirements of periodic reports to this Court and plaintiff by the defendants is proper in order to ensure continuing compliance with this Court's order and to ensure that " * * * new facilities shall, consistent with the proper operation of the school system, be designed and built with the objective of eradicating the vestiges of the dual system and of eliminating the effects of segregation." Kelley v. Altheimer, supra, 378 F.2d at 498, 499.

33. The preponderance of the credible evidence in this record establishes that the plan of desegregation which is educationally most sound and presently practicable, and which also satisfies the requirements of the Constitution, is that prepared and recommended by the United States Office of Education.

The defendant School District is not affluent, but the question is whether its officials have shown that they are financially incapable of adopting the plan despite its preferability in other respects. This showing has not been made, and the evidence establishes conclusively only that this District is unable or unwilling generally to spend what educators think it should; and that precise predictions with respect to future expenditures, revenues, and financial status cannot reliably be made because they depend upon too many variable factors.

Viewing the record overall, and balancing the clear and tangible merits of the plan against the defendants' speculative forebodings, the Court holds it to be feasible and desirable within the District's present circumstances and facilities. Adams v. Mathews, 403 F.2d 181 (C.A. 5, 1968).

## ORDER

This action having come on for trial on the amended complaint of the United States, and also for hearing upon the objections of the United States to the Kennedy School desegregation proposal submitted by the defendants on October 30, 1968, and the Court having considered oral testimony and documentary evidence presented by the parties on January 20–24, 27–31, and February 3–7, 10–14, and 17, 1969, and having considered certain of the oral testimony and documentary evidence submitted by the parties on June 19–21, 24–28 and July 1–2, 1968, during the hearing upon application of the United States for a preliminary injunction, made part of the record of the plenary trial by motion under Rule 65(a) (2) of the Federal Rules of Civil Procedure, and the Court being of the opinion that the objections of the United States to the Kennedy School desegregation proposal should be sustained, and that the permanent relief sought by the United States should be granted, and the Court having entered Findings of Fact and Conclusions of Law, it is hereby:

Ordered, adjudged and decreed, that the objections filed on November 22, 1968, by the United States to the Kennedy School desegregation proposal submitted by the defendants on October 30, 1968, are sustained.

It is further ordered, adjudged and decreed, that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently enjoined from discriminating on the basis of race or color in the operation of School District 151 and in the assignment of teachers and students to schools in that district. As set out more particularly in the body of this decree, the defendants shall take affirmative action

to disestablish school segregation and eliminate the effects of prior unlawful conduct in the operation of the school system.

## FACULTY AND STAFF

1. Race or color shall not be a factor in the hiring, rehiring, assignment, reassignment, transfer, promotion, demotion or dismissal of faculty and professional staff members, including principals and student and substitute teachers, except that affirmative consideration may be given to race as a factor in correcting the effects of prior racial discrimination, as described in paragraphs 9 to 15 of the foregoing Findings of Fact, and in order to accomplish faculty and staff desegregation.

2. All faculty and staff members shall be assigned for the 1969-70 school year and thereafter so that no school in District 151 is identifiable, by the racial composition of its faculty and staff, as tailored for a heavy concentration of either white or Negro pupils. More specifically, the faculty and staff desegregation required herein for 1969-70 and thereafter will have been achieved when the racial composition of the faculty and staff of each school in District 151 is approximately proportional to the racial composition of the total faculty and staff assigned to those grades at all schools in the system.

3. Student and substitute teachers, and all faculty and staff members who serve at more than one school in the system, shall be assigned in accordance with the objective of eliminating the racial identifiability of schools in the system.

4. Upon the entry of this Order, the defendant school officials shall forthwith notify all faculty and staff members that the system allocates its faculty and staff on a racially desegregated basis and, accordingly, that they are subject to reassignment where necessary for compliance with the Court's Order requiring faculty and staff desegregation. All applicants for such positions shall be provided with the same information.

5. The defendants shall maintain records showing, with respect to all faculty and staff members, including student and substitute teachers, the following information: name, race, date of assignment or reassignment, school of assignment, and grade or subject-matter of assignment.

### Student Assignment

6. As specified in paragraph (8), below, the defendants shall adopt and implement, for the school year 1969-70 and thereafter, standards and procedures, with respect to the assignment of pupils to schools, which will ensure equality of educational opportunity, free from segregation on account of race, for all students in the District.

7. The defendants shall, in a matter consistent with the educationally proper operation of the school system as a whole, adopt and implement modifications of the school attendance standards, procedures, and zones specified in paragraph eight (8), below, with the objective of eliminating the effects of prior unlawful conduct in order to ensure equality of educational opportunity to all students, free from segregation on account of race. Upon the adoption of any such modification, and prior to its implementation, the defendants shall serve upon the plaintiff and file with the Clerk of this Court a report setting forth the details of the proposed modification, the number and race of students whose schools of assignment would be affected by it, and the basis for the action taken. Any objections by plaintiff to any proposed modification shall be filed not later than fifteen (15) days after receipt of such report, unless the Court for good cause shown enlarges the period of filing. Notwithstanding the filing of objections by plaintiff, if any, the defendants may implement the proposed modification at the conclusion of fifteen (15) days, unless otherwise ordered by this Court.

8. For the school year 1969-70, and thereafter until modified pursuant to the provisions of paragraph 7, above, or until further order of this Court, the as-

signment of pupils to schools in District 151 shall be as follows:

(a) All students in grades six through eight shall be assigned to the Coolidge/Kennedy school complex which shall be operated as a unified upper grade center

(b) The Eisenhower, Madison, Roosevelt and Taft Schools shall serve grades kindergarten through five. The attendance zones for these schools for students living outside the Village of Phoenix shall be those adopted by the Board of Education by Resolution on September 6, 1966, as modified in March 1968, and continuously in effect since prior to the filing of this action:

"B. That the attendance unit of the Madison School is hereby established as being all that portion of said district lying north of the Little Calumet River and east of the C & EI Railroad.

C. That the attendance unit of the Eisenhower School is hereby established as being all that portion of said district lying east of Cottage Grove Avenue.

D. That the attendance unit of the Taft School is hereby established as being all that portion of the City of Harvey lying within said district also that portion of the Village of South Holland, Illinois, and the unincorporated area in said district lying south and west of the Grand Trunk Railroad. (This zone shall also include the area added to the Taft zone in March of 1968, namely, the area bounded on the north by Route 6, on the east by the C & EI Railroad and on the south and west by the Grand Trunk Railroad.)

E. That the attendance unit of Roosevelt School is hereby established as being all the remaining portion of said district."

(c) Students residing in the Village of Phoenix who are eligible to attend grades Kindergarten through five shall be assigned to the Eisenhower, Madison, Roosevelt and Taft Schools. The attendance zones for such children shall be those utilized for Phoenix children in grades three to six during the 1968–69 school year (as shown in Government Exhibit BBB, pp. 10–11).

| School Assigned | Location in Phoenix |
|---|---|
| Eisenhower | south of 155th Street and northeast of Grand Trunk Railroad |
| Roosevelt | between 153rd Street and 155th Street, east of Vincennes Road |
| Madison | north of 155th Street and west of Vincennes Road; or between 151st Street and 152nd Street |
| Taft | between 152nd Street and 153rd Street |

---

### School Bus Transportation

9. The defendants shall, pursuant to the criteria of safety and distance utilized by them to determine the eligibility of students for transportation to the Taft and Roosevelt Schools through the school year 1967–68 (i. e., students who live more than one and one-half miles from the school of their assignment or who cannot safely walk to the school of their assignment), provide such school bus transportation in 1969–70 and thereafter as is necessary for the full and effective implementation of this Order.

10. No student shall be segregated or otherwise discriminated against on account of race or color in the providing of school bus transportation. To the maximum extent feasible based upon bus capacities, schools to be served, and the

geographic distribution of students, busses shall be routed so as to eliminate or consolidate those different bus routes which serve primarily white or primarily Negro students and are duplicative or overlapping.

### New Construction

11. The defendants shall, in a manner consistent with the educationally proper operation of the school system as a whole, locate any new school and expand any existing school with the objective of disestablishing school segregation and eliminating the effects of prior unlawful conduct in the operation of the school system.

12. Prior to the implementation by the defendants of any plan or program relating to expansion of any existing school, construction of a new school, securing of a site for school expansion or new construction, and prior to the presentation to the electorate of School District 151 of any question or referendum relating to one or more of the foregoing matters, the defendants shall serve upon plaintiff and file with the Clerk of Court one copy each of any board minutes, reports and other written materials reflecting the action proposed to be taken, the planned use of any expansion, new school or site, or the question of referendum to be presented to the electorate.

13. Plaintiff shall file any objections it may have to such action no later than fifteen (15) days after receipt of any such information, unless the Court for good cause shown enlarges the period for filing such objections. Notwithstanding the filing of objections by plaintiff, if any, the defendants may proceed with the implementation of any such action, unless otherwise ordered by this Court.

### Reports to the Court

14. On August 1 of 1969 and each succeeding year thereafter, the defendants shall file with the Clerk of this Court and serve upon plaintiff a report showing, for the forthcoming school year, with respect to each school in the system:

(a) The name and race of the principal;

(b) the number of white and the number of non-white full-time faculty and professional staff members assigned, and the number and grade level or subject-matter of any vacancies;

(c) the name, race, certificate held, and school of prior assignment of all faculty and professional staff members newly employed or newly assigned to any school.

15. Twenty (20) days after the beginning of the school year 1969–70, and each succeeding school year thereafter, the defendants shall file with the Clerk of this Court and serve upon plaintiff a report setting forth the following information for each school in the system and specifying the date or dates of its ascertainment:

(a) The number of white and non-white students in each section of each grade;

(b) complete details of any changes in, or additions to, the date supplied to the Court and plaintiff pursuant to subparagraphs (a), (b), and (c) of paragraph 14, above;

(c) the name, race, subject matter or function, and schedule by school of any faculty or professional staff member assigned to more than one school in the system.

16. In addition to the reports required above, the defendants shall file with the Clerk of this Court and serve upon plaintiff, not later than August 1, 1969, a report setting forth the steps taken to comply with the terms of this Order, including the approximate prospective number of white and non-white students in each grade of each school for the school year 1969–70.

17. All records maintained by the defendants with respect to the operations of School District 151, including the data and materials required to be kept by the terms of this Court's Order, shall, upon reasonable notice, be made available for inspection and copying by plaintiff.

18. The defendants may apply to this Court for an appropriate order to ensure the confidentiality of any information required by the terms of this Order to be filed with the Court or made available for inspection and copying by plaintiff.

### Jurisdiction

19. This Court retains jurisdiction of this matter for all purposes, including enforcement and the issuance, upon proper notice and motion, of orders modifying or supplementing the terms of this Order upon the presentation of relevant information with respect to new school construction, the District's financial position, or any other matter.